**HOFFMAN HOMES, INCORPORATED, formerly known as Hoffman Group, Petitioner,**

v.

**ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 90–3810.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 5, 1991.

Decided April 20, 1992.

Virginia S. Albrecht (argued), Thomas C. Jackson, Albert J. Beveridge, Saone B. Crocker, Beveridge & Diamond, Washington, D.C., for petitioner.

William K. Reilly, E.P.A., Daniel W. Pinkston (argued), Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Thomas J. Martin, Jr., E.P.A., Region 5, Office of Regional Counsel, Chicago, Ill., Catherine Winer, E.P.A., Office of General Counsel/Water Div., Washington, D.C., for respondent.

Ronald A. Zumbrun, Robin L. Rivett, James S. Burling, Charles A. Klinge, Pacific Legal Foundation, Sacramento, Cal., for amicus curiae, Pacific Legal Foundation.

Before WOOD, Jr.* and MANION, Circuit Judges, and ROSZKOWSKI, Senior District Judge.**

MANION, Circuit Judge.

The Environmental Protection Agency, pursuant to section 309 of the Clean Water Act, 33 U.S.C. § 1319(g), imposed an administrative penalty of $50,000 on Hoffman Homes, Inc. for discharging "dredged or fill materials" into "navigable waters" without a permit in violation of sections 301 and 404 of the Clean Water Act, 33 U.S.C. §§ 1311 and 1344. Hoffman admits that it filled an 0.8 acre, intrastate wetland area without a permit. Hoffman appeals, however, arguing that the Clean Water Act does not give the EPA regulatory authority over the wetland. The EPA claims jurisdiction over the intrastate wetland solely on

the ground that migratory birds could, potentially, use the wetland as a place to feed, or nest or as a stopover on the way to the Gulf States for the winter months. Because this goes beyond the limits of the Clean Water Act and the Commerce Clause, we reverse.

## I.

The relevant facts in this case are not in dispute. Hoffman owns a 43-acre parcel of land in Hoffman Estates, Illinois, which it developed into a housing subdivision known as "Victoria Crossings." In preparation for construction of Victoria Crossings, Hoffman filled and graded parts of the site, including an 0.8 acre, bowl-shaped depression at the northeast border of the site. Before it was filled by Hoffman, this small depression was lined with relatively impermeable clay so that rain water could not drain off quickly and would collect in the bottom. The EPA found that the bowl-shaped depression, known as "Area A," was an intrastate wetland.[1] Area A had no surface or groundwater connection to any other body of water. It did not perform sediment trapping or flood control functions for any body of water, was not used for industrial or fishing purposes and was not visited by interstate travelers for recreational or other purposes. In fact, there is not even any evidence that migratory birds, or any other wildlife, actually used Area A for any purpose.

In March 1986, an employee of the Army Corps of Engineers drove by the Victoria Crossings site and noticed that construction had begun. The Corps investigated the site and determined that Hoffman had violated the Clean Water Act (the "Act")

---

* Circuit Judge Wood, Jr. assumed senior status on January 16, 1992, which was after consideration of this case.

** Hon. Stanley J. Roszkowski, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The EPA defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to

support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 40 C.F.R. 230.3(t). The EPA found that Area A was a wetland because it had wetland hydrology (it was inundated with water a sufficient period of time), had a hydric soil (Peotone soil), and supported hydrophytic vegetation (cattails). Hoffman does not challenge this finding on appeal.

by placing fill material into Area A.[2] The Corps issued a cease and desist order requiring Hoffman to stop filling Area A and to apply for an after-the-fact permit. Hoffman stopped filling the wetlands and applied for a permit. Because of objections from the EPA, however, the Corps refused to issue a permit, and in December 1987, the EPA issued a Compliance Order pursuant to section 309(a) of the Act, 33 U.S.C. § 1319(a). The order stated that Hoffman had filled wetlands without a permit in violation of section 301 of the Act, 33 U.S.C. § 1311, ordered Hoffman to cease its filling activities and required that Hoffman restore Area A in accordance with EPA-approved plans. In January 1988, the EPA filed an administrative complaint against Hoffman to enforce the Compliance Order and assess administrative penalties.[3]

After a lengthy evidentiary hearing, the Administrative Law Judge ("ALJ") held that Area A was a wetland within the meaning of the Clean Water Act and EPA regulations. The ALJ concluded, however, that the EPA did not have authority to regulate Area A. The ALJ held that Area A was not subject to regulation under the Clean Water Act because it had no effect on interstate commerce. The EPA appealed, and the EPA Chief Judicial Officer ("CJO") reversed the ALJ's decision. The

CJO held that the EPA has statutory authority to regulate discharges of fill materials into intrastate wetlands that have a "minimal, potential effect" on interstate commerce. The CJO then found that the EPA established this minimal, potential effect on interstate commerce by showing that migratory birds could potentially use Area A. The CJO fined Hoffman $50,000 for filing Area A. Hoffman appeals this decision arguing that the EPA does not have regulatory authority over Area A.[4]

## II.

 Section 404 of the Act prohibits any discharge of dredged or fill materials into "navigable waters" without a permit; it does not mention "wetlands." *See* 33 U.S.C. § 1344. ·"Navigable waters" is defined in the Act as "waters of the United States." 33 U.S.C. § 1362(7). There is no further guidance in the Act as to what "navigable waters" or "waters of the United States" includes.

The EPA, however, has promulgated regulations which further define "waters of the United States." The EPA regulations define "waters of the United States" to include three types of wetlands: (1) interstate wetlands, 40 C.F.R. 2309.3(s)(2); (2) wetlands adjacent to other "waters of the

---

2. The Army Corps of Engineers and the EPA share responsibility for administering and enforcing the Clean Water Act. The EPA has authority to seek penalties for discharge of pollutants into waters of the United States without a permit in violation of 33 U.S.C. § 1311. The EPA can issue an order requiring compliance with the Act, 33 U.S.C. § 1319(a)(3), can bring a civil action for an injunction and penalties, 33 U.S.C. § 1319(b), or may seek administrative penalties, 33 U.S.C. § 1319(g). The Army Corps of Engineers has authority to issue permits to discharge dredged or fill materials into waters of the United States. 33 U.S.C. § 1344(a). In issuing such permits, the Corps applies guidelines established by the EPA. 33 U.S.C. § 1344(b). The Corps also has authority to enforce violations of these permits. 33 U.S.C. § 1344(s). The EPA, however, has a veto power over the issuance of permits when it determines, after consulting with the Corps, that the dredging or fill materials "will have an unacceptable adverse effect on municipal water supplies, shellfish beds ... wildlife, or recreational areas." 33 U.S.C. § 1344(c).

3. Prior to the EPA's filing of the administrative complaint, Hoffman filed an action in district court seeking review of the Compliance Order. That action was dismissed as an impermissible pre-enforcement review of agency action, and this court affirmed. *Hoffman Group, Inc. v. Environmental Protection Agency*, 902 F.2d 567 (7th Cir.1990).

4. The proceedings below also involved a 4.8 acre area on the southern and western borders of the Victoria Crossings site, known as "Area B." Area B is adjacent to and a drainageway for the Schaumburg Branch of Poplar Creek. Poplar Creek is connected to the Fox River which is a tributary of the Illinois River. Both the ALJ and the CJO determined that Area B was a wetland and that Hoffman filled Area B without a permit. Hoffman was fined $50,000 for filling Area B. Hoffman does not appeal the finding that Areas A and B were wetlands, the finding that it filled those areas without a permit, or the $50,000 penalty assessed for the filling of Area B.

United States," 40 C.F.R. 230.3(s)(7); and (3) intrastate, non-adjacent wetlands, "the use, degradation, or destruction of which could affect interstate or foreign commerce," 40 C.F.R. § 230.3(s)(3).[5] Area A is an intrastate, non-adjacent (or "isolated") wetland. According to the EPA definition of "waters of the United States," therefore, the EPA has jurisdiction over such an isolated wetland if "the use, degradation, or destruction" of the wetland "could affect interstate commerce."

The EPA's regulatory construction of the Clean Water Act "is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). Accordingly, we must decide whether it is reasonable—in light of the language, policies and legislative history of the Clean

Water Act—for the EPA to exercise jurisdiction over intrastate, isolated wetlands.[6]

Section 404 of the Clean Water Act and the definition of "navigable waters" as "waters of the United States" originated as part of the Federal Water Pollution Control Act Amendments of 1972. The only guidance as to the meaning of "navigable waters" and "waters of the United States" in the legislative history of the 1972 Amendments is the oft-repeated sentence: "The Conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation." *See* H.R.Rep. No. 92–911, p. 131 (1972); S.Conf. Rep. No. 92–1236, p. 144 (1972), *reprinted in,* 1972 U.S.Code Cong. & Admin.News 3668, 3776, 3822; 118 Cong.Rec. 33692, 33699 (1972) (Oct. 4, 1972 Senate Debate, statement of Senator Muskie); 118 Cong. Rec. 33756–57 (1972) (Oct. 4, 1972 House Debate, statement of Rep. Dingell). There is no mention of wetlands in the legislative history of the 1972 Amendments, however. In fact, the only specific examples in the legislative history of the types of "waters"

---

**5.** The EPA regulation defines "waters of the United States" as follows:

(s) The term "waters of the United States" means:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purposes by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under this definition;

(5) Tributaries of waters identified in paragraphs (s)(1) through (4) of this section;

(6) The territorial sea;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (s)(1) through (6) of this section; waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.

40 C.F.R. § 230.3(s). The Corps definition of "waters of the United States," 33 C.F.R. § 328.2, is identical.

**6.** As noted above, the CJO held that the EPA regulation, 40 C.F.R. 230.3(s)(3), requires only "potential, minimal effect" on interstate commerce and that potential use by migratory birds satisfies this requirement. The CJO's interpretation of the regulation is entitled to even more deference than the EPA's regulatory construction of the Clean Water Act. *Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901, 907 (7th Cir. 1990) ("Further, we defer even more to an agency's construction of its own regulation."). However, because we conclude that the regulation— so far as it purports to give the EPA jurisdiction over intrastate, isolated wetlands—is not a reasonable interpretation of the Clean Water Act, we need not decide whether the CJO's "potential, minimal effect" test is a reasonable interpretation of the regulation.

that the Clean Water Act was intended to cover are actual waters: lakes, streams, rivers, tributaries, and the territorial seas. *See* S.Rep. No. 92–414, p. 77 (1972), *reprinted in*, 1972 U.S.Code Cong. & Admin.News 3668, 3742–43; 118 Cong.Rec. 33692, 33699 (1972) (Oct. 4, 1972 Senate Debate, statement of Senator Muskie); 118 Cong.Rec. 33756–57 (1972) (Oct. 4, 1972 House Debate, statement of Rep. Dingell). Thus, there is no indication in the 1972 legislative history that "waters"—no matter how broadly interpreted—include wetlands.

Nonetheless, relying primarily on the above snippet from the legislative history, some circuits, including this one, have concluded that Congress' grant of authority under the Clean Water Act extends to all waters, and their *adjacent* wetlands, within constitutional reach under the Commerce Clause. *See United States v. Tull,* 769 F.2d 182, 184 (4th Cir.1985), *rev'd on other grounds,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *United States v. City of Fort Pierre,* 747 F.2d 464, 465 (8th Cir. 1984); *United States v. Lambert,* 695 F.2d 536, 538 (11th Cir.1983); *United States v. Byrd,* 609 F.2d 1204, 1209 (7th Cir.1979). *See also National Wildlife Federation v. Consumers Power Co.,* 862 F.2d 580, 589 (6th Cir.1988) (impoundment of waters); *Utah v. Marsh,* 740 F.2d 799, 802 (10th Cir.1984) (intrastate lake). No circuit, however, has concluded that section 404 jurisdiction extends to wetlands which are not adjacent to "waters of the United States."

In *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court affirmed the view that section 404 jurisdiction extends to adjacent wetlands. The Court focused on the stated purpose of the Clean Water Act " 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' " *Id.* at 132, 106 S.Ct. at 462 (quoting section 101 of the Clean Water Act, 33 U.S.C. § 1251). The Court found that Congress intended the Clean Water Act to protect "aquatic ecosystems" and that this intent "demand[s] broad federal authority to control pollution, for '[w]ater moves in hydrologic cycles and

it is essential that discharge of pollutants be controlled at the source.' " *Id.* at 132–33, 106 S.Ct. at 462 (quoting S.Rep. No. 92–414, p. 77 (1972)).

Adjacent wetlands, the Court noted, function to prevent flooding, to prevent erosion, and to filter and purify water draining into adjacent bodies of water. *Id.* at 134, 106 S.Ct. at 463. Thus, "wetlands adjacent to navigable waters do as a general matter play a key role in protecting and enhancing water quality." *Id.* at 133, 106 S.Ct. at 462. Protection of adjacent wetlands, therefore, furthers the stated objective of the Clean Water Act. Because wetlands adjacent to "waters of the United States" are an "integral part of the aquatic environment," the Court concluded that the Corps of Engineers' regulation extending section 404 jurisdiction to adjacent wetlands (*see supra,* n. 5) was a reasonable interpretation of the Clean Water Act. *Id.* at 135, 106 S.Ct. at 463.

This case involves non-adjacent, or isolated, wetlands. Although the Court in *Riverside* stated that "Congress chose to define the waters covered by the Act broadly," *id.* at 133, it did not hold that section 404 jurisdiction extends to isolated wetlands. *Id.* at 131, n. 8, 106 S.Ct. at 461, n. 8. The Supreme Court's reasoning in *Riverside* leads to the conclusion that the Clean Water Act does not give the EPA authority to regulate isolated wetlands. Isolated wetlands, unlike adjacent wetlands, have no hydrological connection to any body of water. By their very definition, isolated wetlands have no relationship or interdependence with any other body of water. Thus, isolated wetlands, like Area A, are not part of an aquatic ecosystem and do not control floods or pollution in other bodies of water. Protection of isolated wetlands, therefore, would not further the objective of the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

The EPA argues that the legislative history of the Federal Water Pollution Control Amendments of 1977 supports the position that section 404 jurisdiction extends to iso-

lated wetlands. In 1977, both the House and the Senate passed bills to amend the Clean Water Act, and there were efforts in both bodies to limit section 404 jurisdiction. The House bill (H.R. 3199) amended section 404 to apply to "navigable waters and adjacent wetlands" and limited the definition of "navigable waters" to "waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce." H.R.Rep. No. 95–139, pp. 44–45 (1977). By excluding waters not actually or potentially navigable, this proposed definition of navigable waters was even less inclusive than the definition previously used by the Army Corps of Engineers. *Id.* at 23–24. In the Senate, during the debate over the Senate bill amending the Clean Water Act (S. 1952), an identical amendment was introduced but rejected. 123 Cong.Rec. 26710–26729 (1977) (August 4, 1977 Senate Debate; amendment # 726, introduced by Sen. Bentsen). The bill that was finally reported out of conference, and passed, excluded the more restrictive language and thus did not amend the scope of the section 404 permit authority. H.R.Conf.Rep. No. 95–830, pp. 37–44 (1977), *reprinted at* 1977 U.S.Code Cong. & Admin.News 4424, 4472–80.

We hesitate to attribute any level of significance to Congress' failure to amend section 404. The views of the 95th Congress in 1977 regarding the extent of the section 404 permit authority established by the 92d Congress in 1972 are, at best, very questionable evidence of the intent of Congress in 1972. *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990) ("But subsequent legislative history is a 'hazardous basis for inferring intent of an earlier' Congress."). However, the Supreme Court in *Riverside* examined the 1977 legislative history and found it significant to the issue of whether the Act covers adjacent wetlands. The Court noted that Congress' rejection of the proposed limits to section 404 jurisdiction was based "in large part [on] its concern that protection of wetlands would be unduly hampered by a narrowed definition of 'navigable waters.'" *River-*

*side,* 474 U.S. at 137, 106 S.Ct. at 464. The Court also found it significant that "even those who would have restricted the reach of [section 404] jurisdiction would have done so not by removing wetlands altogether from the definition of 'waters of the United States,' but only by restricting the scope of 'navigable waters' under section 404 to waters navigable in fact *and their adjacent wetlands.*" *Id.* at 137, 106 S.Ct. at 464 (emphasis in original). The Court stated that the 1977 legislative history provides "additional support for a conclusion that Congress in 1977 acquiesced in the Corps' definition of waters as including *adjacent* wetlands." *Id.* at 138, 106 S.Ct. at 465 (emphasis added).

The Supreme Court in *Riverside* did not state that the legislative history to the 1977 Amendments provides support for the extension of the section 404 permit authority to isolated wetlands, and we do not believe that it does. As the Supreme Court recognized in *Riverside,* the debate in 1977 was about narrowing the definition of "navigable waters" to exclude waters not navigable in fact. Critics of the proposed changes were opposed to leaving non-navigable waters and their adjacent wetlands unprotected. *See, e.g.,* 123 Cong.Rec. 10405 (1977) (statement of Rep. McKinney) ("Limiting the definition of wetlands to navigable waterways would have severe implications on efforts to keep our present wetlands intact...."); 123 Cong.Rec. 10416 (1977) (statement of Rep. Bonior) ("I would like the same protection for other wetlands along smaller bodies of water which are presently not used for commerce although they may have been in the past."). A "narrower definition of 'navigable waters,'" opponents of the amendment argued, "would exclude vast stretches of crucial wetlands from the Corps' jurisdiction, with detrimental effects on wetland ecosystems, water quality, and the aquatic environment generally." *Riverside,* 474 U.S. at 136, 106 S.Ct. at 464.

There was no suggestion that section 404 jurisdiction should extend to wetlands not adjacent to open bodies of water. There is no mention of isolated wetlands in the 1977

legislative history. Rather, the congressmen who opposed the proposed changes discussed the important functions of adjacent wetlands and the need to protect such wetlands. For example, in the House, Representative Bonior stated:

> Under this definition of 'navigable waters' only wetlands adjacent to navigable waters would be protected by the act. Wetlands are one of this Nation's largest resources because they provide a natural filtration system for our waterways, and the sedimentation process, and provide a spawning ground for a huge variety of fish and waterfowl. Wetlands are a very fragile resource which is constantly in danger of being eliminated by dredge and fill operations and contractor's quests for more land. This valuable, fragile resource must be protected. Yet under this definition of 'navigable waters,' 90 percent of this Nation's wetlands would not be protected.
>
> Wetlands are especially necessary for the filtration of waterways near large urban areas where the pollution is the worst. Many of the waterways near urban centers are not navigable and their wetlands would not be protected under this bill.

123 Cong.Rec. 10416 (1977). Senator Baker also noted that wetlands provide natural treatment of pollutants and protection from floods, and stated:

> I might add that if we did not have those wetlands, the cost of abating pollution in this country by industry and municipalities would be enormously increased because of the additional costs that would be required by the technology to take the place of what nature has provided us.

123 Cong.Rec. 26718 (1977). *See also* 123 Cong.Rec. 10415 (1977) (statement of Rep. Lehman) ("wetlands provide free of charge $140 billion worth of flood protection and water purification services"); 123 Cong. Rec. 26716–17 (1977) (statement of Sen. Chafee) (wetlands "retard the flow of water from the land and thus reduce the opportunities for flooding," "prevent erosion" and "serve to purify the water by filtering out and absorbing silt, nutrients, and pollutants that otherwise would enter into domestic water supplies"). Only adjacent wetlands, of course, have these important attributes. Thus, even in 1977, Congress was only concerned with protecting wetlands adjacent to waters of the United States.

Neither the Clean Water Act nor its legislative history, either in 1972 or 1977, mention isolated wetlands. Further, both the stated policy of the Act and the legislative history demonstrate that Congress did not intend the Act to protect isolated wetlands. The stated policy of the Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The legislative history merely documents this section's concern for maintaining the ecological balance of our nation's waters. Wetlands which are adjacent to open bodies of water control pollution and flooding in those waters, thus contributing to maintaining "the chemical, physical, and biological integrity of the Nation's waters." Accordingly, although it is difficult to say "wetlands" are "waters," the Supreme Court in *Riverside* held that adjacent wetlands are within the scope of the Act. But, wetlands which are not adjacent to open bodies of water, isolated wetlands, do not control pollution or flooding of any waters. Isolated wetlands do not contribute to maintaining "the chemical, physical, and biological integrity of the Nation's waters." Accordingly, they are not within the scope of the Act. The EPA's construction of section 404 to include authority over isolated wetlands, including Area A, is unreasonable. 40 C.F.R. § 230.-3(s)(3), as it applies to isolated wetlands, is contrary to the Act and therefore invalid.

### III.

■ Despite our conclusion that the Clean Water Act does not regulate isolated wetlands, we still must address this court's previous statement in *United States v. Byrd*, 609 F.2d 1204, 1209 (7th Cir.1979), that Congress intended the Clean Water Act to regulate "all the 'navigable waters' within its constitutional reach" under the Commerce Clause. The *Byrd* case involved

only adjacent wetlands; we held that adjacent wetlands were within "constitutional reach." The court in *Byrd*, however, was not faced with defining the outer limits of section 404 jurisdiction and did not decide that Congress intended to regulate isolated wetlands. Nonetheless, the court did state that "the legislative history of the Amendments establishes that Congress wanted to give the term 'navigable waters' the 'broadest possible constitutional interpretation.' " *Id.* (quoting S.Conf.Rep. No. 92–1236, p. 144 (1972)). Even if Congress did intend to regulate all "navigable waters," including all wetlands, within its constitutional reach under the Commerce Clause, however, the EPA's claim of authority to regulate Area A is unreasonable if Area A is beyond that constitutional reach. The issue thus becomes: Is Area A within constitutional reach under the Commerce Clause? *See Id.* at 1209 ("Given a Congressional intent to extend its water pollution regulations to all 'navigable waters' within its constitutional reach, the next step is to determine whether the particular regulations at issue fall within that reach."). We believe that Area A is not within the reach of the Commerce Clause; this is a second reason for reversing the EPA's decision.

The Constitution grants Congress the power "[t]o regulate Commerce ... among the several States...." Art. I, § 8, cl. 3. Despite the language of the Commerce Clause, "[t]he power of Congress over interstate commerce is not confined to the regulation of commerce among states." *United States v. Darby*, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609 (1941). Rather, the Commerce Clause power has been broadly interpreted to extend to "the regulation through legislative action of activities intrastate which have a substantial effect on the commerce or the exercise of the Congressional power over it." *Id.* at 119–20, 61 S.Ct. at 460. *See also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964) ("Thus the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which

might have a substantial and harmful effect upon that commerce."); *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942) ("But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce...."). Further, "[w]here the *class of activities* is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971) (quoting *Maryland v. Wirtz*, 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968)).

In addition, our review of congressional action pursuant to the Commerce Clause is "relatively narrow." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). "[W]hen Congress has determined that an activity affects interstate commerce, the courts need inquire only whether the finding is rational." *Id.* at 277, 101 S.Ct. at 2360. "A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce...." *Hodel v. Indiana*, 452 U.S. 314, 323–24, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981).

However, "there are constitutional limits on the power of Congress to regulate pursuant to the Commerce Clause." *Virginia Surface Mining*, 452 U.S. at 309, 101 S.Ct. at 2390 (Rehnquist, J., concurring). "Some activities may be so private or local in nature that they simply may not be *in* commerce." *Id.* at 310, 101 S.Ct. at 2391. *See also Katzenbach v. McClung*, 379 U.S. 294, 302, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964) ("The activities that are beyond the reach of Congress are those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general power of the government.") (citation omitted).

"Moreover, simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Virginia Surface Mining*, 452 U.S. at 311, 101 S.Ct. at 2391 (Rehnquist, J., concurring). Congress' findings are reviewable and should not merely be rubber-stamped by the courts.

To support its regulation of Area A, the EPA relies on the following sentence from *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 282, 101 S.Ct. 2352, 2363, 69 L.Ed.2d 1 (1981):

Finally, we agree with the lower federal courts that have uniformly found the power conferred by the Commerce Clause broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State.

Despite the broad language of this quote, *Virginia Surface Mining* does not support the EPA's position that the Commerce Clause is broad enough to permit regulation of Area A. In *Virginia Surface Mining*, the Supreme Court discussed how the pollution (in that case, surface mining activities) affected interstate commerce. The Court quoted extensively from congressional findings on the adverse impact of surface coal mining on interstate commerce, *see id.* at 277–80, 101 S.Ct. at 2361–62, and concluded, "we cannot say that Congress did not have a rational basis for concluding that surface coal mining has substantial effects on interstate commerce." *Id.* at 280, 101 S.Ct. at 2362.

The lower court cases which the Supreme Court cited in *Virginia Surface Mining* also upheld regulations of pollution under the Commerce Clause because the pollution affected interstate commerce. The first case cited by the Supreme Court in *Virginia Surface Mining* is this circuit's opinion in *United States v. Byrd*, 609 F.2d 1204 (7th Cir.1979), holding that the Commerce Clause power is broad enough to allow Congress to regulate adjacent wetlands. The defendant in *Byrd* had been enjoined from filling the waters and adjacent wetlands of Lake Wawasee, Indiana. *Id.* at

1205. Lake Wawasee is "a 2,500 to 3,000 acre fresh water lake used by interstate travelers and seasonal residents for water-related recreational purposes." *Id.* The defendant in *Byrd* argued that Congress lacked authority under the Commerce Clause to regulate the wetlands adjacent to Lake Wawasee. *Id.* at 1209–11. The court rejected this argument, noting, as did Congress in the legislative history and the Supreme Court in *Riverside*, that destruction of the adjacent wetlands would "degrad[e] the water quality of the lake." *Id.* at 1210. If Lake Wawasee was polluted, interstate travelers would no longer use the lake thus affecting interstate commerce:

The recreational use of inland lakes has a significant impact on interstate commerce, as is testified to by the number of out-of-state visitors to Lake Wawasee in particular. The value of these lakes depends, in part, on the purity of their water for swimming, or the abundance of fish and other wildlife inhabiting them or the surrounding wetland and land areas. The Corps, among other authorities, has come to recognize the importance of wetlands adjacent to lakes in preserving the biological, chemical, and physical integrity of the lakes they adjoin. Destruction of all or most of the wetlands around Lake Wawasee, for example, could significantly impair the attraction the lake holds for interstate travelers by degrading the water quality of the lake, thereby indirectly affecting the flow of interstate commerce.

*Id.* at 1210. The court concluded, therefore, "that Congress constitutionally may extend its regulatory control of navigable waters under the Commerce Clause to wetlands which adjoin or are contiguous to intrastate lakes that are used by interstate travelers for water-related recreational purposes." *Id.*

The Supreme Court in *Virginia Surface Mining* also cited *United States v. Ashland Oil & Transportation Co.*, 504 F.2d 1317 (6th Cir.1974). In that case, Ashland Oil was fined $500 for discharging oil into Little Cypress Creek, a tributary of a navigable stream. The Sixth Circuit upheld the 1972 Amendments to the Clean Water Act

over a Commerce Clause attack noting the many interstate commerce effects of polluting navigable streams:

> Obviously water pollution is a health threat to the water supply of the nation. It endangers our agriculture by rendering water unfit for irrigation. It can end the public use and enjoyment of our magnificent rivers and lakes for fishing, for boating, and for swimming. These health and welfare concerns are, of course, proper subjects for Congressional attention because of their many impacts upon interstate commerce generally. But water pollution is also a direct threat to navigation—the first interstate commerce system in this country's history and still a very important one.

*Id.* at 1325–26.[7]

*Utah v. Marsh,* 740 F.2d 799 (10th Cir. 1984), decided after *Virginia Surface Mining,* reached the same conclusion as *Byrd* and *Ashland Oil.* In *Marsh,* the State of Utah sought a declaration that the Army Corps of Engineers did not have regulatory authority over Utah Lake. *Id.* at 801. Utah Lake, with a surface area of 150 square miles, is the largest freshwater lake in Utah. *Id.* at 800. The Utah Lake State Park, owned and operated by the State of Utah, is located on the east shore of the lake. The State of Utah argued that "the reach of congressional power under the Commerce Clause does not extend to Utah Lake because that lake has no navigable connection in interstate commerce and the lake, by itself, does not affect interstate commerce." *Id.* at 803. The Tenth Circuit rejected this argument and concluded that "the discharge of dredged or fill material into Utah Lake by plaintiff or others could well have a substantial economic effect on interstate commerce." *Id.* In support of its conclusion, the court listed the extensive interstate activities supported by the waters of Utah Lake:

> Waters from Utah Lake are used to irrigate crops which are sold in interstate commerce, and the lake supports the State's most valuable warm water fishery which markets most of the catch out of state. The lake also provides recreationists with opportunities to fish, hunt, boat, water ski, picnic, and camp, as well as the opportunity to observe, photograph, and appreciate a variety of bird and animal life; nonresident visitation at the lake has averaged 6,919 persons per year, or 2% of total visitation over the 1967–1980 period. Such interstate movement of travelers has been held to be within the reach of the Commerce Clause. Finally, the lake is on the flyway of several species of migratory waterfowl which are protected under international treaties.

*Id.* at 803–04 (citations omitted).

These cases, and *Virginia Surface Mining,* state only that the Commerce Clause is broad enough to allow regulation of perceived pollution that "may have effects in *more than one state*"—that is, pollution that affects interstate commerce. *See also United States v. Tull,* 769 F.2d 182, 185 (4th Cir.1985), *rev'd on other grounds,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (following *Virginia Surface Mining* and *Byrd* ). The case law leaves little doubt that tributaries of navigable waters, intrastate waters which are used to irrigate crops, support a fishery, or are visited by interstate travelers, and wetlands adjacent to such waters may be regulated under the Commerce Clause. Polluting such waters and their adjacent wetlands affects interstate commerce.

In this case, however, the EPA has not even attempted to construct a theory of how filling Area A affects interstate commerce. And, no evidence on the record would support any such theory. For example, there is no evidence that filling Area A would affect navigation. There is no evi-

---

7. The Supreme Court also cited with approval a series of cases holding that Congress has authority under the Commerce Clause to regulate air pollution. This conclusion is based on the congressional finding that the movement of pollutants in air and across state lines interferes with

interstate commerce. *See, e.g., United States v. Bishop Processing Co.,* 287 F.Supp. 624, 629–32 (D.Md.1968), *aff'd,* 423 F.2d 469 (4th Cir.), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1695, 26 L.Ed.2d 63 (1970).

dence that filling Area A would pollute another open body of water used for irrigation, fishing or recreational activities. There is no evidence that interstate travelers visited Area A (and it is hard to imagine any purpose for their doing so). In *Marsh*, one of the many perceived impacts on interstate commerce was the ability of people to observe and appreciate a variety of bird and animal life; also, Utah Lake was a "flyway" for migratory waterfowl protected under international treaties. Not only is there no evidence that interstate travelers came to Area A to watch or photograph birds protected by an international treaty, there is no evidence that migratory birds of any feather ever actually used Area A.

Rather, the EPA claims jurisdiction solely because migratory birds could, *potentially*, use Area A. Since creation (of the states), migratory birds have flown interstate. But this annual traverse by itself does not affect commerce. The birds obviously do not engage in commerce. Until they are watched, photographed, shot at or otherwise impacted by people who do (or, we suppose, have the potential to) engage in interstate commerce, migratory birds do not ignite the Commerce Clause. The idea that the *potential* presence of migrating birds itself affects commerce is even more far-fetched.

No federal court has ever held that the mere presence of wildlife—actual or potential, interstate or intrastate—is enough to invoke the Commerce Clause power. In *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), the Supreme Court held that a Virginia licensing statute which prohibited non-citizens from fishing commercially in state waters was preempted by a federal licensing statute regulating fishing in state waters. During its discussion of the preemption issue, the Supreme Court noted that the Commerce Clause was broad enough "to regulate the taking of fish in state waters." *Id.* at 281–82, 97 S.Ct. at 1750. But, the Court did not uphold the constitutionality of the licensing scheme just because fish were swimming in the waters. Rather, the Court stated that the

power to regulate exists "where there is some effect on interstate commerce." "The movement of vessels from one State to another in search of fish, and back again to processing plants, is certainly activity which Congress could conclude affects interstate commerce." *Id.* at 282, 97 S.Ct. at 1750. In other words, the "taking" of the fish by people fishing interstate (not the fish themselves) activated the Commerce Clause.

A similar conclusion was reached by the Ninth Circuit in *United States v. Helsley*, 615 F.2d 784 (9th Cir.1979). *Helsley* involved a challenge to the Airborne Hunting Act, 16 U.S.C. § 742j–1, which prohibits hunting for any bird, fish or other animal "while airborne in an aircraft." The court held that the federal statute was a proper exercise of the Commerce Clause power because Congress was "acting to promote safety in an artery of commerce." *Id.* at 787. The court relied on the effect airborne hunting has on commerce. The birds were incidental. The law's purpose was to "regulate for the safety of the national air space." *Id.* Thus, although the wildlife attracted the airborne hunters, it was the hazard the hunters created, not the presence of the birds, that justified the law.

The Endangered Species Act, 16 U.S.C. § 1531 et seq., which prohibits the importing, exporting, taking, selling, and transporting of endangered species, was upheld against a Commerce Clause attack in *Palila v. Hawaii Dept. of Land and Natural Resources*, 471 F.Supp. 985 (D.Ha.1979), aff'd, 639 F.2d 495 (9th Cir.1981). Even in this case, directly involving the regulation of wildlife, the court did not rely on the mere presence of animals, interstate or intrastate. Rather, the court pointed to the interstate commerce effects of protecting endangered species:

"In this context, a national program to protect and improve the natural habitats of endangered species preserves the possibilities of interstate commerce in these species and of interstate movement of persons, such as amateur students of nature or professional scientists who come to a state to observe and study

these species, that would otherwise be lost by state inaction."

*Id.* at 995. The court concluded that the state's program of preserving herds of "wild" sheep and goats which destroyed the habitat of an endangered bird constituted an unlawful "taking" of the bird by the state. *Id.*

Thus, in these Commerce Clause precedents, the government has come forward with some connection, no matter how tenuous, with human activity. In this case, however, the EPA has not even attempted to put forth any theory about how filling Area A affects interstate human activity. There is no evidence of interstate visitors or any adverse impact on interstate commerce in migratory birds. Area A was not used for hunting or fishing. The EPA has presented no relevant authority for its position that the mere presence, or potential presence, of wildlife is sufficient to invoke the Commerce Clause power. Without such authority, and without evidence connecting Area A with some human economic activity, we cannot hold that filling Area A has any effect on interstate commerce. Thus, "it is clear that there is no rational basis," *see Hodel*, 452 U.S. at 323–24, 101 S.Ct. at 2383, for Congress to have found that filling Area A affected interstate commerce. Area A is not within constitutional reach under the Commerce Clause.[8]

IV.

To summarize, the EPA's regulation of Area A is beyond the limits of the Commerce Clause and the Clean Water Act. There is nothing in the Clean Water Act, congressional findings, or the record to suggest that the filling of Area A has any effect on interstate commerce. Hoffman's filling of this 0.8 acre, isolated "wetland" is a purely local activity. The EPA has provided evidence of only one interstate connection: Area A is a potential landing site for migratory birds. Although we recognize that the Commerce Clause power is broad, it has never been extended to reach all areas in (much less those only potentially in) migratory bird flyways. Such an extension, we believe, " 'would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.' " *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 309, 101 S.Ct. 2352, 2390, 69 L.Ed.2d 1 (1981) (Rehnquist, J., concurring) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)). After all, what area of the United States is not a potential landing spot for migratory birds?[9] The Commerce Clause, at the very

---

8. The EPA also cites *Leslie Salt Co. v. United States*, 896 F.2d 354 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1089, 112 L.Ed.2d 1194 (1991), which arguably supports its position. *Leslie Salt* involved a dispute about the Corps' jurisdiction under the Clean Water Act over intrastate waters. The court stated, in dicta and without explanation, that "[t]he commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds." *Id.* at 360 (citing *Marsh* and *Palila*). Two cases involving the Rivers and Harbors Act, which were not cited by the EPA, could also be stretched to support the EPA's arguments. In *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir.1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975), the defendant was enjoined from filling a lagoon on the coast of New Jersey. The court stated, also in dicta and without explanation, that "undoubtedly Congressional legislative power under the Commerce Clause would be broad enough to encompass federal regulation of any activities affecting the marine ecology." *Id.* at 607. In *Zabel v. Tabb*, 430 F.2d 199 (5th Cir.1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971), landowners sued to compel the Corps to issue a permit allowing them to fill part of the navigable waters in Coca Ciega Bay near St. Petersburg, Florida. Although the point was not contested by the parties, the court stated, without explaining, that "the destruction of fish and wildlife in our estuarine waters does have a substantial, and in some areas a devastating, effect on interstate commerce." *Id.* at 204. These cases are obviously distinguishable from this case on the facts. Further, the broad statements in the cases are perfunctory dicta made without any analysis, and therefore, we do not give them any weight.

9. In fact, when attempting to answer this question at oral argument, the EPA admitted that migratory birds would land and drink from a puddle in the median of a highway, thus, presumably, allowing regulation of the puddle under the EPA's broad reading of the Commerce Clause. Although the EPA magnanimously conceded that it would not have authority over such

least, requires some connection to human commercial activity. It does not allow regulation of animals just because they are animals which we want to protect. Commerce is a uniquely human activity; thus, Congress, or the EPA, must demonstrate some human impact before the Commerce Clause comes into play. The EPA has not even attempted to show any human impact in this case, and Area A, therefore, is outside of the reach of the Commerce Clause power.

Even if the Commerce Clause allowed regulation of Area A, the Clean Water Act does not give the EPA authority over Area A. The legislative history of the Clean Water Act indicates that Congress intended to protect the "aquatic ecosystems" of this nation's waters. But Area A is an intrastate, isolated wetland. Such wetlands are not part of aquatic ecosystems and protection of them would not further the stated policy of the Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." The Clean Water Act is not a comprehensive wildlife protection statute. Although the Act mentions wildlife as an important result of controlling pollution, the purpose of the Act is to restore and maintain clean water, not to conserve wildlife.

Congress can act to conserve this country's wildlife and has demonstrated its ability to do so. The United States Code is filled with statutes, enacted as early as 1918, explicitly designed to conserve this country's wildlife, including migratory birds. Statutes such as the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq., and the Endangered Species Act, 16 U.S.C. § 1531 et seq., make it unlawful to hunt, take, kill, sell, ship, import or export certain species

of wildlife. Several statutes explicitly authorize the Secretary of the Interior to acquire land for migratory bird refuges. *See, e.g.,* 16 U.S.C. § 690 et seq. (Bear River Migratory Bird Refuge Act); 16 U.S.C. § 691 et seq. (Cheyenne Bottoms Migratory Bird Refuge Act); 16 U.S.C. § 695 et seq. (The Migratory Waterfowl and Other Wildlife Refuge in California Act); 16 U.S.C. § 715 et seq. (The Migratory Bird Conservation Act). Wetlands, too, are protected in federal conservation statutes. The Water Bank Act, 16 U.S.C. § 1301 et seq., authorizes the Secretary of Interior to enter agreements with private landowners to preserve wetlands. The landowners agree not to drain, fill or otherwise destroy wetlands they own in exchange for an annual payment from the federal government.

Such statutes have been upheld as proper exercises of the Treaty Power and the Property Clause. In *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), the Supreme Court upheld the Migratory Bird Treaty Act which prohibited the killing, capturing or selling of any migratory bird included in the terms of a migratory bird treaty with England.[10] The Court stated that "[i]f the treaty is valid there can be no dispute about the validity of the statute under Article I, § 8, as a necessary and proper means to execute the powers of government." *Id.* at 432, 40 S.Ct. at 383.[11] In *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), the Supreme Court upheld a statute authorizing the Secretary of the Interior to protect wild free-roaming horses and burros on public lands as a proper exercise of congressional power under the Property Clause.[12] The Court stated that "the Prop-

a puddle because it would not classify as a wetland, this answer does not in any way restrict the limitless scope of the Commerce Clause power under the EPA's interpretation.

**10.** The Migratory Bird Treaty Act has subsequently been amended to include treaties with Mexico, Japan and the U.S.S.R. 16 U.S.C. § 703.

**11.** Article II, § 2 of the Constitution states, in part, that "The President ... shall have Power, by and with the Advice and Consent of the Senate, to make Treaties...." Article I, § 8

gives Congress the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States," including laws to execute valid treaties.

**12.** The Property Clause, Article IV, § 3, cl. 2, gives Congress the power to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."

erty Clause also gives Congress the power to protect wildlife on the public lands, state law notwithstanding." *Id.* at 546, 96 S.Ct. at 2295 (citations omitted). *See also North Dakota v. United States,* 460 U.S. 300, 310, 103 S.Ct. 1095, 1101, 75 L.Ed.2d 77 (1983) ("In the absence of federal legislation to the contrary, the United States unquestionably has the power to acquire wetlands for waterfowl production areas, by purchase or condemnation, without state consent.").

Regulating privately-owned land pursuant to the Commerce Clause as a means to protect the environment, including wildlife, is of relatively recent origin. Until the 1970's, the federal government's conservation efforts relied primarily on the Treaty Power and the Property Clause. Perhaps the reliance on the Commerce Clause is the result of the Supreme Court's jurisprudence constricting application of the Takings Clause. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Penn Central Transportation Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). However, after the Supreme Court decides *Lucas v. South Carolina Coastal Council,* 404 S.E.2d 895 (1991), *cert. granted,* —— U.S. ——, 112 S.Ct. 436, 116 L.Ed.2d 455 (Nov. 18, 1991), argued March 2, 1992, the federal government or, more accurately, taxpayers, might be forced to bear the cost of our national conservation efforts, rather than imposing such costs on fortuitously chosen landowners like Hoffman Homes, Inc.[13]

## V.

For the foregoing reasons, the petition for review of the final decision of the Environmental Protection Agency is GRANTED, and the EPA's order, as far as it requires Hoffman Homes to pay a $50,000 administrative penalty for the filling of Area A, is VACATED.[14]

---

13. *See, e.g.* L. Gordon Crovitz, *Justices Have No Reason to Fear Private Property,* Wall St.J., Nov. 27, 1991, at A11 ("The Takings Clause, if enforced, would stop endless debates about wetlands, timber inhabited by spotted owls, landmark designations and rent control. All these could be regulated—but only if taxpayers decide it's worth compensating the owners, who would have less reason to object.").

14. The part of the EPA order requiring Hoffman Homes to pay a $50,000 administrative penalty for filling Area B was not appealed to this court and is not affected by this decision.