**Russell C. DOANE, Plaintiff,**

v.

**Michael ESPY, Secretary, United States Department of Agriculture, Defendant.**

91–C–852–C.

United States District Court, W.D. Wisconsin.

July 20, 1993.

Alan R. Malasky, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for plaintiff.

Christa A. Reisterer, Asst. U.S. Atty., Madison, WI, for defendant.

## OPINION and ORDER

CRABB, Chief Judge.

This is a civil action for declaratory relief in which plaintiff seeks judicial review of defendant's decision to deny him benefits under the Disaster Assistance Act of 1988, 7 U.S.C. § 1421 note, §§ 201–224. Plaintiff contends that defendant acted arbitrarily, capriciously and contrary to law when he promulgated regulations that consider an applicant's gross income rather than net income to determine eligibility for financial relief under the Act. Additionally, plaintiff contends that defendant acted contrary to law when he included in plaintiff's gross income calculation certain revenues received by the Chippewa Valley Bean Company, a company in which plaintiff has a majority ownership interest. Defendant disputes plaintiff's contentions and has counterclaimed for disaster overpayments made to plaintiff prior to the finding that he was ineligible for assistance under the Act. Jurisdiction exists pursuant to 28 U.S.C. § 1331.

The case is before the court on the parties' cross-motions for summary judgment. I conclude that defendant's decision to base eligibility for disaster benefits on a concept of gross income rather than net income is reasonable and that defendant did not act in an arbitrary and capricious manner when he included in plaintiff's gross revenues all revenues earned by the Chippewa Valley Bean Company. Accordingly, summary judgment will be denied to plaintiff and granted to defendant.

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact

and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1412 (7th Cir. 1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). The opposing party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish the existence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2548, 2553. Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

For the purpose of deciding this motion only, I find from the parties' proposed findings of fact that the following facts are undisputed.

## UNDISPUTED FACTS

Plaintiff Russell C. Doane resides in Menomonie, Wisconsin and owns Doane Farms in Dunn County, Wisconsin. Doane Farms raises dark red kidney beans and corn. In 1987, plaintiff was an authorized Bidwell combine dealer and sold farm machinery, including Bidwell combines.[1] In addition to operating Doane Farms and selling farm machinery, plaintiff owned a sixty percent interest in the Chippewa Valley Bean Company in Menomonie, Wisconsin.

Defendant Michael Espy is the Secretary of the United States Department of Agriculture. As such, he is the official responsible for the administration of the Disaster Assistance Act of 1988 and for the determinations

---

1. Plaintiff seeks benefits for the 1988 crop loss based on calendar year 1987 financial data.

made under the Act by the Agriculture Stabilization and Conservation Service, including the Deputy Administrator's determinations of December 18, 1992 and January 22, 1993 that plaintiff was not eligible for benefits under the Act for crop losses sustained in 1988.

In 1987, plaintiff's corn and kidney bean farming operations had gross revenues of $1,962,154.03 and produced a net taxable annual income in excess of $100,000. Under the Act, plaintiff is treated as one "person" with the Chippewa Valley Bean Company, which is a licensed public warehouse for the storage and handling of kidney beans and which acts as a marketing agent for producers who wish to sell their kidney beans. As a marketing agent, the Chippewa Valley Bean Company negotiates a sales price with a potential buyer that is then communicated to the beans' owner for the producer's acceptance or rejection. If the producer accepts the price offered by the buyer, the Chippewa Valley Bean Company ships the beans to the buyer, who sends the purchase price to the company, which deducts its selling commission and expenses and remits the balance to the producer. Whenever the company acts as a marketing agent for a producer of kidney beans, the producer maintains title to the beans until they are sold.

In 1987, the Chippewa Valley Bean Company collected over $2.8 million on behalf of its clients in its role as a marketing agent. In addition, the company sold its own kidney beans and received $550,413.31 from those sales. In total, the Chippewa Valley Bean Company collected $3,382,995.13 in proceeds of bean sales in 1987. Of that amount, the company earned $749,481.93 from (1) sales of company-owned beans ($550,413.31) and (2) commissions from sales of other producer's beans ($199,068.67). For tax purposes, the company had an overall loss of $131,762.78 in 1987.

In plaintiff's capacity as an authorized dealer for Bidwell combines, plaintiff had gross revenues in 1987 of $48,000 and a net income of $14,479.10. In sum, plaintiff's 1987 gross revenue from farming operations was $1,962,154.04 and his net income from farming operations was over $100,000. Plaintiff's

1987 gross revenues from non-farming operations (all proceeds from the Chippewa Valley Bean Company and the Bidwell dealership combined) were $3,382,995.13. His gross income from the sale of company-owned beans and commissions alone was $749,481.93. Plaintiff sustained a net loss of $117,283.68 from non-farming operations.

Plaintiff applied for benefits under the Disaster Assistance Act of 1988, claiming losses to his 1988 crop of kidney beans and corn. As part of his application, plaintiff certified that his 1987 "qualifying gross income," as defined in 7 C.F.R. § 1477, did not exceed $2 million. On this basis, plaintiff received disaster benefits in the amount of $99,558 from the Commodity Credit Corporation.

In opinions dated December 18, 1992 and January 22, 1993, the Deputy Administrator for State and County Operations determined that plaintiff's gross revenues from farming were $1,962,154.03 and that plaintiff's gross revenues from nonfarming operations were $3,431,975.10. The deputy administrator included all $3,382,995.13 (revenues of Chippewa Valley Bean Company) in plaintiff's nonfarm gross revenues, even though the deputy administrator recognized that of the $3,382,-995.13, all but $550,413.31 was derived from sales of kidney beans not owned by the Company and for which the Company was acting only as an agent for producers.

In making his computations, the deputy administrator did not distinguish between "annual income" and "gross revenue," and he included funds collected by the Chippewa Valley Bean Company as a marketing agent that never belonged to plaintiff or the Company. On that basis, the deputy administrator determined that a majority of plaintiff's total gross income was from plaintiff's nonfarm operations as shown:

| | | |
|---|---|---|
| 1. | Farm gross revenue (income)— | $1,962,154.03 |
| 2. | Nonfarm gross revenue (income)— | |
| | a. CVB's total bean sales— | $3,382,995.13 |
| | b. Sale of Bidwell Combine— | $ 48,800.00 |
| | TOTAL: | $5,393,949.16 |

From this computation, the deputy administrator calculated plaintiff's "qualifying gross revenue" for purposes of the Act as the sum of his gross revenues from his farming

operations and nonfarming operations, or $5,393,949.16. Because the deputy administrator determined that plaintiff's qualifying gross revenues exceeded $2 million, he adjudged plaintiff ineligible for disaster benefits and directed him to repay all funds he had received from the Commodity Credit Corporation. Defendant has recovered part of the overpayments in offsets and has filed a counterclaim in this action for the remaining sum. Plaintiff has appealed the deputy director's determination through all administrative levels and seeks a return of the offsets.

## OPINION

This case raises two discrete questions of law: (1) whether it was arbitrary, capricious or otherwise contrary to law for defendant to adopt the concept of "gross income" rather than "net income" or "profits" for purpose of the majority-of-income test in § 231; and (2) whether it was error to include in plaintiff's nonfarm gross income the proceeds from sales collected by the Chippewa Valley Bean Company as a marketing agent on behalf of bean producers.

*"Gross Income" versus "Net Income" or "Profits"*

In Title I of the Disaster Assistance Act of 1988, 7 U.S.C. § 1421 note, §§ 201–241, Congress directed the Secretary of the Department of Agriculture to provide financial assistance to eligible producers who suffered losses of production during the 1988 crop year as a result of drought, hail, excessive moisture and related conditions. § 1421 note, §§ 201(a), 202(a). Congress set out financial eligibility criteria for benefits in § 231 of the Act:

(a) General Rule—A person that has qualifying gross revenues in excess of $2,000,000 annually, as determined by the Secretary of Agriculture, shall not be eligible to receive any disaster payments or other benefits under this title.

(b) Qualifying gross revenues—For purposes of this section the term "qualifying gross revenues" means—

(1) if a majority of the person's annual income is received from farming, ranching, and forestry operation, the gross

revenue from the person's farming, ranching, and forestry operations; and

(2) if less than a majority of the person's annual income is received from farming, ranching, and forestry operations, the person's gross revenue from all sources.

7 U.S.C. § 1421 note, § 231. Persons who have "qualifying gross revenues" in excess of $2,000,000 annually as determined by defendant are not eligible to receive disaster benefits under the Act. Eligibility determinations for disaster benefits for the 1988 crop loss were based on applicants' 1987 financial data.

Federal regulations define "annual gross income" as (1) the annual gross income from a person's farming, ranching and forestry operations, if more than 50% of the person's annual gross income is from these operations; or (2) the person's total gross income from all sources, if less than 50% of the person's annual gross income is from farming, ranching and forestry operations.

Specifically, the regulations provide the following formula:

[S]uch a person, defined in Part 795 of this Title, who has annual gross income in excess of $2.0 million shall not be eligible to receive disaster payments under this Part. For purposes of this determination, annual gross income means:

(1) With respect to a person who receives more than 50 percent of such person's gross income from farming, ranching, and forestry operations, the annual gross income from such operations; and

(2) With respect to a person who receives 50 percent or less of such person's gross income from farming, ranching, and forestry operations, the person's total gross income from all sources.

7 C.F.R. § 1477.3(g) (1989). The effect of these regulations was to make eligibility determinations hinge on gross income or total receipts rather than net income or profits. In other words, a farmer who has $1 million in receipts and $500,000 in profits from farm operations and $5 million in receipts and $200,000 in profits from nonfarm operations is ineligible for benefits under the regula-

tions because her gross income from farm and nonfarm operations together exceed $2 million. If profits or net income were the relevant benchmark, the hypothetical farmer would be eligible for benefits because over 50% of her net income derived from farming operations and her gross revenues from farming operations were less than $2 million.

If the determination of plaintiff's eligibility for benefits were made on the basis of net income, the analysis would be as follows: in 1987, plaintiff's gross revenues from farming operations totaled $1,962,154.03 and his net income from farming operations was in excess of $100,000. Plaintiff's gross revenues from non-farming operations totaled either $3,382,995.13 or $798.281.98 and his net income was a loss of $117,283.68.[2] Because plaintiff's net income from farming operations was a majority of his annual net income from all sources, only his gross revenues from farming operations would have been used to determine qualifying gross revenues under § 231. Plaintiff's gross revenues from farming operations were $1,962,154.03, which is less than the $2 million eligibility ceiling. In fact, however, because the regulations used "gross income" as the meaningful factor for determining whether plaintiff's farm income alone or farm income and nonfarm income together were to be considered in calculating plaintiff's gross revenues, plaintiff was ineligible for assistance. Defendant used plaintiff's annual *gross* income from nonfarm operations ($3,382,995.13 from Chippewa Valley Bean Company plus $48,800 from sales of Bidwell combines) and then found plaintiff's nonfarm income was a majority of his annual gross income (compared with plaintiff's *gross* income from farming operations of $1,962,154.03). Under this approach, plaintiff's qualifying gross revenues were the sum of his farm and nonfarm gross revenues, or over $5 million, far exceeding the $2 million statutory limit.[3] Plaintiff contends that defendant is misinterpreting Con-

gress's intent when he uses "gross income" in the eligibility regulations rather than net income or profits as a substitute for the "annual income" language in § 231. Not to treat "annual income" as different from "gross revenues," he argues, reads the term annual income out of the statute.

■ As an initial matter, defendant argues that this case should be treated as an action for mandamus relief because plaintiff seeks an affirmative benefit from the public. Defendant relies heavily on *Southeastern Peanut Ass'n v. Lyng*, 734 F.Supp. 519, 523 (M.D.Ga.1990), to support his argument. He maintains that plaintiff can prevail only if he can show that he has a clear entitlement to relief and that defendant has a clearly established duty to perform the requested act. However, *Lyng* does not support defendant's argument. In that case, the plaintiffs, members of a peanut grower association, were asking the court to set aside regulations promulgated by the Secretary of Agriculture regarding allowances for "shrinkage" and to compel the Secretary to adopt a specific percentage allowance. The district court refused to issue a mandate because plaintiffs had failed to show either that they had a clear right to a certain percentage or that defendant had a clear duty to adopt a specific percentage. *Lyng*, 734 F.Supp. at 524. The court reasoned that because the statute in question placed discretion for setting shrinkage allowances in the Secretary, plaintiffs' remedy lay with the legislature. *Id.*

Defendant's assertion that this is properly an action for mandamus is unpersuasive. Plaintiff is not asking the court to require defendant to issue a particular regulation or set a particular standard. Instead, plaintiff contends only that defendant's usage of "gross income" to determine eligibility is arbitrary, capricious and contrary to the governing provisions of the Act. This type of challenge to an agency's interpretation of

---

**2.** The parties' dispute over whether plaintiff's gross revenues from nonfarm operations is the lesser or greater of the two figures is addressed below and is irrelevant to the present discussion.

**3.** Plaintiff does not contest defendant's combining him with the Chippewa Valley Bean Company for eligibility purposes. *But see Hanson v.*

*Madigan*, 788 F.Supp. 403 (W.D.Wis.1992) (holding arbitrary and capricious Secretary's policy of adding gross revenues of farmer with gross revenues of farmer's wholly-owned corporation to determine whether farmer eligible for disaster benefits).

applicable law is a straightforward question of law subject to general principles of judicial review that is easily distinguishable from the mandamus action in *Lyng*.

 In the alternative, defendant asserts that by using the words "as determined by the Secretary" in § 231 of the Act, Congress intended to preclude judicial review of defendant's eligibility formula. *See* 5 U.S.C. § 701(a)(2). There is a strong presumption that Congress intended judicial review of administrative action, *see Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 669, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986). Congress must make its intent clear if it wishes to preclude review. *Johnson v. Robison*, 415 U.S. 361, 373–74, 94 S.Ct. 1160, 1168–69, 39 L.Ed.2d 389 (1975). Agency decisions are nonreviewable under the Administrative Procedure Act, 5 U.S.C. § 701, only when the governing statute is drawn so broadly that it does not provide judicially manageable standards or when the statute involves questions of judgment and choice, such as the delegation of prosecutorial authority. *See Webster v. Doe*, 486 U.S. 592, 600, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988) (statutory delegation allowing termination of employment whenever Director of Central Intelligence Agency "shall deem such termination necessary or advisable in the interests of the United States" committed to agency discretion); *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (agency decision not to initiate enforcement proceedings presumptively unreviewable).

 In delegating authority to defendant to determine benefit eligibility under the Act, Congress provided a general formula and delegated to defendant the power to decide how to calculate "annual income" in light of the formula provided in § 231 and the overall purposes of the statute. This is neither the sort of delegation that would provide a court no means by which to judge whether defendant carried out the design of the statute nor the type that requires defendant to use discretionary judgment or make particularized enforcement decisions in a particular case once he has issued regulations of general applicability. It is notable that defendant is unable to find a single case that uses either mandamus or "committed to agency discretion" as the standard of review when reviewing defendant's rulemaking action pursuant to the Disaster Assistance Act of 1988. In fact, courts have decided these types of cases pursuant to the general review provisions contained in the Administrative Procedure Act, 5 U.S.C. § 706. *See, e.g., Madsen v. Dept. of Agriculture*, 866 F.2d 1035, 1036–37 (8th Cir.1989); *Jones v. Espy*, 1993 WL 102641, 1993 U.S.Dist. LEXIS 3285 (D.D.C. 1993); *Hanson v. Madigan*, 788 F.Supp. 403 (W.D.Wis.1992); *Golightly v. Yeutter*, 780 F.Supp. 672, 675, 678–79 (D.Ariz.1991); *Justice v. Lyng*, 716 F.Supp. 1570, 1579–80 (D.Ariz.1989).[4]

 The standard of review to be applied is whether defendant's decision to use gross income to administer the majority-of-income test in § 231 is arbitrary and capricious or a misinterpretation of governing law. 5 U.S.C. § 706(2)(A); *Esch v. Yeutter*, 876

---

4. In a footnote, defendant makes the additional argument that the Tucker Act, 28 U.S.C. §§ 1346, 1491, requires that plaintiff proceed with his case in the Court of Claims because his claim is one for "money damages" against the United States in excess of $10,000. Case law does not support this position. Courts addressing this issue have concluded that "money damages" are intended to provide a victim with monetary compensation for an injury to person, property or reputation whereas an action for declaratory or injunctive relief is an attempt to recover the very thing to which the plaintiff believes she is entitled, which may include "monetary relief." *Bowen v. Massachusetts*, 487 U.S. 879, 895, 108 S.Ct. 2722, 2732, 101 L.Ed.2d 749 (1988) (Tucker Act does not bar claim "for funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [plaintiff] will suffer or has suffered by virtue of withholding of those funds"); *Peterson Farms v. Madigan*, 782 F.Supp. 1, 3 (D.D.C.1991) (Tucker Act does not bar suit in district court to recover funds withheld by Department of Agriculture); *DCP Farms v. Yeutter*, 761 F.Supp. 1269, 1275 (N.D.Miss.1991) (Tucker Act does not bar suit in district court to reverse government decision denying plaintiffs farm program benefits), *rev'd on other grounds*, 957 F.2d 1183 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992). It is significant that all the cases cited by defendant in support of its argument were decided prior to *Bowen*.

F.2d 976, 991 (D.C.Cir.1989). Pursuant to this standard, I must engage in a two-part inquiry to determine whether defendant has engaged in a permissible construction of the Act under his congressionally-delegated authority to administer the Act. The first question is "whether Congress has directly spoken to the precise issue in question. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron v. Natural Res. Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). However, if the statute is silent or ambiguous with respect to the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. If the answer is "yes," the agency's legislative regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782; *Hoffman Homes v. Administrator,* 961 F.2d 1310 (7th Cir.1992) (administrative action must be upheld if it is reasonable in light of language, policy and legislative history).

■ Pursuant to this standard, I cannot conclude that it is arbitrary, capricious or manifestly contrary to the governing provisions of the Act for defendant to use "gross income" to determine whether the majority of a person's "annual income" is farm or nonfarm derived. Contrary to plaintiff's assertions, Congress's use of the term "annual income" in § 231 is not a clear indication that it intended that defendant base qualifying gross income calculations on net income or profit rather than on gross income or gross revenues. Plaintiff cites a 1955 accounting manual for the proposition that "income" is revenue received minus the cost and expenses incurred to produce the revenue (profits) and that "gross revenue" is computed without regard for costs and expenses associated with producing the revenue (sales). He argues that because Congress used two different terms in § 231, "annual income" and "gross revenues," it must have meant to give different meanings to those terms. In his view, defendant has ignored the intent of Congress by collapsing these very different concepts into "gross income."

I cannot say that Congress's intent is as clear as plaintiff suggests. It is not certain that Congress intended to rely on traditional accounting principles when it drafted § 231. It would have been helpful for Congress to have provided its own definition of "annual income," but it failed to do so. In the absence of any evidence that Congress considered and adopted the specialized definitions plaintiff cites I am hesitant to read the statute as incorporating them.

Plaintiff argues that the term "income" is understood ordinarily as meaning *net* income, yet the very accounting bulletin cited by plaintiff advocates assigning a net or profit concept to the term "income" because the use of "income" alone is confusing. The bulletin's author recommends that the qualifiers "net" or "gross" always be used with "income" to avoid confusion. Dictionary definitions of "income" further erode plaintiff's argument that "annual income" denotes "net income" or "profits." *See, e.g., Webster's College Dictionary* 618 (Random House 1991) ("1. the monetary payment received for goods or services or from other sources, such as rents or investments; revenue; receipts; *an annual income of $25,000* ") (emphasis in original). The ambiguity of the term "income" belies plaintiff's contention that Congress expressed a clear intention that a net or profit concept should be used in administering the majority-of-income test.

Because it is not possible to determine from the statute whether Congress intended net income or gross income to be used in determining eligibility under § 231 of the Act, I must defer to defendant's construction of the statute so long as it is not arbitrary, capricious or otherwise contrary to law. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83. I do not find that it is. First, it is important to note that ultimately, Congress intended eligibility to hinge on gross revenues. Once the defendant determines whether the majority of person's "annual income" is from farming or nonfarming sources, he is to calculate "qualifying gross revenues" from the "gross revenues" (sales) from either farming operations or combined

operations. It is unlikely that Congress would have intended that the defendant use a very different net income or profit concept in applying the first clause of § 231 without making it explicit that he do so. *See Vculek v. Yeutter,* 754 F.Supp. 154, 156 (D.N.D.1990) (interpreting § 231 of the Act and upholding Secretary's reliance on "gross income" in regulations in absence of any indication in language of statute that Congress intended to rely on net income in applying majority-of-income test), *aff'd without op.,* 950 F.2d 727 (8th Cir.1991); *Haubein Farms v. Dept. of Agriculture,* 824 F.Supp. 239 (D.D.C.1993) ("plaintiff provides no support, either from the Act itself or the legislative history, to prove that Congress wanted this calculation [majority-of-income test] to be based upon net profits").

Furthermore, it is important to note that § 231 specifies expressly that the meaning of "qualifying gross revenue" is left to the Secretary. *See* 7 U.S.C. § 1421, note § 231(a) ("A person who has qualifying gross revenues in excess of $2,000,000 annually, *as determined by the Secretary of Agriculture....*"). Although this delegation does not shield defendant from judicial review, it provides additional support for defendant's assertion that substantial deference should be given his construction of this provision of the Act. Finally, I consider it significant that since the time defendant enacted the regulation at issue, Congress has re-enacted § 231 of the Disaster Assistance Act two more times without changing the "annual income" language and without indicating to defendant that it believed defendant was using the "annual income" concept incorrectly in determining qualified gross revenues. *See* P.L. 101–82, 103 Stat. 565, August 14, 1989, codified at 7 U.S.C. § 1421 *note* (providing benefits for 1989 crop loss); Title XXII of P.L. 101–624, 104 Stat. 3962–3977, November 28, 1990, codified at 7 U.S.C. § 1421 *note* (providing ongoing benefits for 1990 crop and subsequent crops); *see also NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) (according great weight to administrative interpretation of statute where Congress has reenacted the statute without pertinent change). Given the great degree of deference owed to defendant

under *Chevron* and the lack of support for plaintiff's suggested construction of the statute, I cannot say that defendant's reliance on gross income to make majority-of-income determinations is arbitrary, capricious or otherwise contrary to law. Summary judgment will be granted for defendant on this issue.

### Revenues Earned By Chippewa Valley Bean Company

■ Plaintiff contends that even if it is permissible for defendant to use of gross income for the majority-of-income test, plaintiff is entitled to disaster benefits because the deputy administrator acted in an arbitrary and capricious manner when he included in plaintiff's nonfarm gross income the sale proceeds collected by the Chippewa Valley Bean Company that it turned over to the producers of those beans. The parties do not dispute that the Chippewa Valley Bean Company acted as a marketing agent for producers by locating a buyer for the beans, communicating the price, delivering the beans to the buyer, collecting the sale price, deducting a commission and ultimately remitting the proceeds to the beans' owner. In this capacity, the company collected $2,832,-581.82 on behalf of producers, which defendant included in the company's gross income and imputed to plaintiff. According to plaintiff, because the company never actually owned the beans and turned over the sale proceeds to the beans' producers, defendant erred by assigning all proceeds collected by the company to plaintiff's nonfarming gross income instead of assigning just the commissions plus proceeds from sale of company-owned beans in the amount of approximately $700,000.

Plaintiff's argument is unconvincing. First, the parties agree that the decision to include the bean sale proceeds in the company's gross income is a question of law. As such, the decision should be affirmed unless it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Morales v. Yeutter,* 952 F.2d 954, 957 (7th Cir.1991). In including all proceeds from bean sales in the company's income even though all but approximately $700,000 of the proceeds was turned over ultimately to the beans' produc-

ers, the deputy administrator cited its policy of including in a "person's" gross income all revenues over which it exercised "control." Plaintiff contends that a "control" test is arbitrary and capricious. He cites examples from the Agriculture Stabilization and Conservation Service's Handbook to prove his point. In Example 1, an auction house collected $40,000 for the sale of livestock and placed the money in an auction house account, later paying the sellers of livestock the proceeds from sales, minus commission, from the auction house account. In Example 2, the auction house deposited the $40,000 earned from sales of livestock into a special custodial account for the sellers, set up according to the Packers and Stockyards Administration regulations, 7 U.S.C. § 196(b). The funds in the custodial account were trust funds; the only checks that could be written on the account were checks to the sellers of livestock and checks to the general account of the auction house for marketing charges. According to the handbook, in Example 1, all proceeds earned from sale of livestock are included in the auction house's gross income, while in Example 2, only the commissions paid to the auction house from the trust account are included. Plaintiff argues that it is illogical for defendant to give differing treatment to the two auction houses just because one auction house placed its proceeds received on behalf of sellers in a trust account; in neither example did the auction house have any right to the sale proceeds or any opportunity to benefit from the proceeds. In both cases, the auction house must turn over to the sellers of livestock all proceeds minus commissions. In plaintiff's view, creation of a trust fund is an arbitrary distinction designed merely to relieve defendant of the modest task of investigating applications for disaster benefits from consignees or agents such as plaintiff to determine the actual ownership of the goods in question and the ultimate recipient of the sale proceeds.

Defendant makes several arguments in response. First, he argues that an entity that sells goods as an agent or consignee is not materially different from any person with revenues who must pay for services, wages and other expenses associated with the cost of producing income. Second, defendant ar-

gues that plaintiff is simply revisiting his previous argument that disaster benefits should be based on net income rather that gross income or total sales. Finally, defendant argues that Congress never intended that defendant should investigate all business operations to trace the path of all goods and proceeds going in and coming out.

Defendant could have prescribed any number of methods for determining whether sales revenues should be attributed to the gross revenues of a consignee or agent that would have produced more precise results that the one he chose. However, I cannot say that it was arbitrary or capricious for him to conclude that it would provide clear direction and ease of administration for the county committees if the test were the straightforward one of differentiating between revenues placed in a trust account and revenues commingled in the general accounts. His policy is consistent with the idea that disaster benefits should be based on *all* income received by a person in the course of doing business. Plaintiff is correct that a marketing agent for bean producers that turns over the bulk of sale proceeds to those producers is different for financial purposes from a company that pays wages, expenses and overhead out of total revenues. However, defendant has the better argument: attempting to trace the path of all income traveling through a business would be an unreasonable administrative burden in a large-scale assistance program such as this and such a burden was not intended by Congress. Finally, I note that plaintiff does not argue that the Chippewa Valley Bean Company was unable to set up a special account for revenues earned on behalf of bean producers that would have met with defendant's approval. Accordingly, I will grant defendant's motion for summary judgment on the issue of the allocation of the Chippewa Valley Bean Company revenues.

### ORDER

IT IS ORDERED that plaintiff's motion for summary judgment is DENIED and defendant's motion for summary judgment is GRANTED. Plaintiff is ordered to return to defendant the funds he received from the

Commodity Credit Corporation for his 1988 bean crop losses, less those amounts previously credited to his account. The Clerk of Court is directed to enter judgment accordingly and to close this case.