**SOLID WASTE AGENCY OF NORTHERN COOK COUNTY, Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, et al., Defendants.**

No. 94 C 7489.

United States District Court, N.D. Illinois, Eastern Division.

March 25, 1998.

Russell R. Eggert, Julian C. D'Esposito, Jr., Mayer, Brown & Platt, Chicago, IL, George J. Mannina, Jr., Gary C. Adler, David L. Anderson, O'Connor and Hannan, Washington, DC, for Plaintiff.

Joseph M. Ferguson, Asst. U.S. Atty., Chicago, IL, Myron M. Cherry, Peter A. Flynn, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

This action concerns the future of a 533–acre parcel of real estate owned by plaintiff Solid Waste Agency of Northern Cook County. Defendant United States Army Corps of Engineers asserted regulatory jurisdiction over the property after determining that it contained approximately fifty-five acres of navigable waters as defined by the Clean Water Act. 33 U.S.C. § 1362(7). It then denied plaintiff a permit to develop the property under section 404 of that statute. 33 U.S.C. § 1344(a). Plaintiff sought judicial review of these actions under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. ("APA"), and the parties filed cross-motions for summary judgment on the issue of jurisdiction. For the reasons below, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted.

### I. Factual and Procedural Background

Plaintiff Solid Waste Agency of Northern Cook County ("SWANCC") is a municipal corporation created by intergovernmental agreement under the laws of Illinois. Plaintiff owns a 533–acre parcel of real estate located in Cook and Kane Counties, which, due to its prior incarnation as a gravel mining pit, contains large surface depressions that now hold rainwater and other precipitation. Plaintiff sought to convert approximately 180 acres of the property into a balefill, a repository for non-hazardous solid waste that cannot be recycled or otherwise removed from the waste stream. The Army Corps of Engineers determined that 17.6 acres of the balefill area contained "navigable waters" as defined by the Clean Water Act,

33 U.S.C. § 1362(7), and it therefore required plaintiff to obtain a permit for the project under section 404(a) of that statute, 33 U.S.C. § 1344(a).

Section 404(a) of the Clean Water Act authorizes the Corps to issue permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The Clean Water Act defines navigable waters as "the waters of the United States." 33 U.S.C. § 1362(7). By regulation, the Army Corps of Engineers has further defined the phrase "waters of the United States" to include "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce." 33 C.F.R. § 328.3(a)(3). In a preamble to this regulation, the Corps has explained that the term "other waters" includes those which "are or would be used as habitat by other migratory birds which cross state lines." 51 Fed.Reg. 41,217 (Nov. 13, 1986). For lack of a better term, perhaps, this language in the preamble has been described as the "migratory bird rule."

On March 12, 1986, plaintiff invited the Corps to determine whether its property contained any "apparent wetlands." (R. 34,594.) On April 17, 1986, the Corps indicated that the SWANCC property did not contain any wetlands or lakes as defined by 33 C.F.R. § 323.2(c) and (e). On February 25, 1987, after acquiring additional land, plaintiff again requested the Corps to indicate whether its property contained any "protected wetlands." (R. 34,598.) On March 4, 1987, the Corps issued a virtually identical letter stating that the property did not contain any wetlands or lakes under 33 C.F.R. §§ 323.2(b) or 328.3(b). In each letter, the agency stated that it did not have jurisdiction over the property and that plaintiff would not need a permit to develop it.

On July 8, 1987, the Illinois Nature Preserves Commission asked the Corps to consider whether the SWANCC property might be subject to federal jurisdiction under 33

C.F.R. § 328.3(a)(3) on the grounds that four different species of migratory birds had been observed there. The agency agreed, and on November 16, 1987 it asserted jurisdiction over the waters on the SWANCC property for the reason that they were used or could be used as a habitat by migratory birds. It explained that its previous denial of jurisdiction "was based on the fact that the water areas did not meet the definition of a wetland or lakes, and not on the broader definition of 'waters of the United States.'" (R. 34,619.) Plaintiff then submitted two successive applications for a section 404(a) permit to begin the balefill project. When those applications were denied, plaintiff filed the instant lawsuit.

The parties have filed cross-motions for partial summary judgment on the issue of whether the Army Corps of Engineers has regulatory jurisdiction over the 17.6 acres of water on the proposed balefill site. A supplemental brief in support of the government's motion was submitted by intervenor-defendants Village of Bartlett and Citizens Against the Balefill. Plaintiff has argued that the Corps lacks jurisdiction because (1) the migratory bird rule exceeds the legislative authority created by the commerce clause, (2) the agency's assertion of jurisdiction over the waters of the proposed balefill was arbitrary and capricious, (3) the migratory bird rule goes beyond the mandate of the Clean Water Act, and (4) the rule was adopted in violation of the notice and comment requirements of the APA. On May 22, 1997, the court heard oral argument on these issues, and it will now address them in turn.

## II. *Discussion*

### A. *Commerce Clause*

█ Plaintiff contends that the waters of the proposed balefill site are not subject to federal regulatory jurisdiction under the commerce clause. It argues that the migratory birds on the balefill site do not have any relationship with interstate commerce because they do not support any human commercial activity on the site itself. Noting

that the balefill area is closed to the public and is not visible from adjacent properties, plaintiff reasons that it cannot be subject to federal jurisdiction because "[b]irds do not conduct commerce, people do." (Pl.'s S.J. Mem. at 3.) The court must therefore decide whether the commerce clause authorizes the federal government to exercise regulatory jurisdiction over isolated intrastate waters that serve as a habitat for migratory birds.

The Seventh Circuit addressed this very issue in *Hoffman Homes, Inc. v. Administrator, U.S. EPA*, 961 F.2d 1310 (7th Cir. 1992) *"Hoffman Homes I "*. In that case, a residential developer was fined after it filled a one-acre pond on its property without a permit. *Id.* at 1311. The EPA had asserted jurisdiction over the pond pursuant to 40 C.F.R. § 230.3(s)(3)[1] after finding that it could be used as a habitat by migratory birds. *Id.* at 1311–1312. The Seventh Circuit held that the EPA had exceeded its authority under the commerce clause by extending jurisdiction over the pond based solely on its potential use as a habitat for migratory birds. *Id.* at 1321–1322. Reasoning that birds do not affect commerce until they are "watched, photographed, shot at or otherwise impacted by the people who do," *id.* at 1320, the court explained that:

> The EPA has provided evidence of only one interstate connection: [The pond] is a potential landing site for migratory birds. Although we recognize that the Commerce Clause power is broad, it has never been extended to reach all areas in (much less those only potentially in) migratory bird flyways. Such an extension, we believe, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. After all, what area of the United States is not a potential landing spot for migratory birds? The Commerce Clause, at the very least, requires some connection to human commercial activity.

*Id.* at 1321–1322 (citations omitted). In addition to holding that 40 C.F.R. § 230.3(s)(3)

---

1. The EPA's definition of "waters of the United States" at 40 C.F.R. § 230.3(s)(3) is identical to that adopted by the Army Corps of Engineers at 33 C.F.R. § 328.3(a). *See Hoffman Homes II*, 999 F.2d at 260.

was unconstitutional, the court concluded that the regulation went beyond its statutory mandate because the Clean Water Act did not authorize the regulation of isolated intrastate wetlands. *Id.* at 1316.

On rehearing, the court vacated its first opinion and held that 40 C.F.R. § 230.3(s)(3) did not violate the commerce clause. *Hoffman Homes, Inc. v. EPA,* 999 F.2d 256, 260–261 (7th Cir.1993) (*"Hoffman Homes II"*). The court explained that it was reasonable for the EPA to interpret the regulation as extending its jurisdiction to waters whose connection with interstate commerce was "potential rather than actual, minimal rather than substantial." *Id.* at 261. It further explained that the potential use of wetlands by migratory birds was sufficient to invoke commerce clause jurisdiction because "millions of people annually spend more than a billion dollars on hunting, trapping, and observing migratory birds" and "the cumulative loss of wetlands has reduced populations of many bird species." *Id.* at 261. The court nevertheless ruled in favor of the developer because the EPA had not presented substantial evidence that the water site was a suitable or potential habitat for migratory birds. *Id.* at 261–262.

The Seventh Circuit has not been alone in suggesting that the migratory bird rule is a valid application of federal commerce clause power. In *Leslie Salt Co. v. United States,* 896 F.2d 354 (9th Cir.1990), a company sought to develop a property that contained surface depressions as a result of previous industrial usage. *Id.* at 355–356. The Army Corps of Engineers asserted jurisdiction over the site under 33 C.F.R. § 328.3(a) because the excavations collected water on a seasonal basis and could be used as a habitat for migratory birds. *Id.* at 357, 360. The district court held that the ponds were not "other waters" under 33 C.F.R. § 328.3(a) because they were not of a natural origin and were only seasonally filled. *Leslie Salt Co. v. United States,* 700 F.Supp. 476 (N.D.Cal. 1988) (*"Leslie Salt I"*). The Ninth Circuit reversed, explaining that the "commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered

species." *Leslie Salt Co. v. United States,* 896 F.2d 354, 360 (9th Cir.1990) (*"Leslie Salt II"*). When the Court of Appeals remanded the case to the district court to determine whether the ponds could be used as a habitat by migratory birds, the district court found that the property was a seasonal home to more than fifty species of migratory birds and was thus subject to federal commerce clause jurisdiction. *Leslie Salt Co. v. United States,* 820 F.Supp. 478, 480 (N.D.Cal.1992) (*"Leslie Salt III"*). On a second appeal, the Ninth Circuit affirmed this finding and reiterated that the migratory bird rule was a valid exercise of the federal commerce clause power. *Leslie Salt Co. v. United States,* 55 F.3d 1388, 1392 (9th Cir.1995) (*"Leslie Salt IV"*).

The Tenth Circuit reached a similar result in *Utah v. Marsh,* 740 F.2d 799 (10th Cir. 1984). In that case, the Army Corps of Engineers asserted regulatory jurisdiction over an intrastate lake pursuant to a regulation which, like 33 C.F.R. § 328.3(a), conferred administrative authority over isolated wetlands whose degradation or destruction could affect interstate commerce. *Id.* at 802 & n. 4, 803. Plaintiff argued that the lake had no effect on interstate commerce because it was located entirely within the borders of the state. *Id.* at 803. The court explained that the lake was subject to federal commerce clause jurisdiction because, among other things, it was "on the flyway of several species of migratory waterfowl which are protected under international treaties." *Id.* at 804.

These cases establish that the commerce clause authorizes the federal government to regulate isolated intrastate waters that serve as a habitat for migratory birds. The reason for this rule, it seems, is that the cumulative degradation of intrastate waters could have a substantial effect on interstate commercial interests relating to those birds. *See Hoffman Homes II,* 999 F.2d at 261 ("cumulative loss of wetlands has reduced populations of many bird species and consequently the ability of people to hunt, trap, and observe those birds"). Under this rule, a federal agency may assert jurisdiction over intrastate waters even if the destruction of those particular

waters will not have a substantial effect on interstate commerce and there is no evidence that migratory birds support human commercial activity there.

There is reason to consider whether this rule remains valid after the recent decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In that case, the Supreme Court held that Congress exceeded its commerce clause powers by imposing criminal sanctions on the possession of handguns in local school zones. *Id.* 514 U.S. at 551, *discussing* 18 U.S.C. § 922(q). The government argued that the prevention of violent crime in local school zones was related to interstate commerce because education promotes a sound national economy, the threat of violence deters interstate travel, and the cost of violent crime is spread to the population as a whole through insurance. *Id.* at 563–564. After surveying the history of commerce clause jurisprudence, the Court explained that the commerce clause authorizes Congress to regulate (1) the use of the channels of interstate commerce, (2) the instrumentalities of interstate commerce, or the persons or things in interstate commerce, and (3) activities that substantially affect interstate commerce. *Id.* at 558–559. Deciding that only the last category applied to the statute in question, the Court held that the possession of a gun in a local school zone is not "an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567. It further explained that the statute could not be sustained under case law upholding the regulation of activities "that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 561. The statute was therefore declared unconstitutional.

The Fourth Circuit has recently suggested that the migratory bird rule is unconstitutional under *Lopez.* In *United States v. Wilson,* 133 F.3d 251 (4th Cir.1997), the appellant was convicted of filling intrastate wetlands without a permit in violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(2)(A) and 1311(a). *Id.* at 254. The Army Corps of Engineers had asserted jurisdiction over the fill areas pursuant to 33 C.F.R. § 328.3(a)(3), and the appellant challenged the validity of this regulation under both the Clean Water Act and the commerce clause. Writing for the majority, Judge Niemeyer stated in dicta and without explanation that the regulation presented "serious constitutional difficulties, because, at least at first blush, it would appear to exceed congressional authority under the Commerce Clause." *Id.* at 257. Writing separately, Judge Luttig declined to adopt this portion of the majority opinion on the grounds that it was based on an overly expansive reading of the commerce clause. *See Wilson,* 133 F.3d at 266 (Luttig, J., dis.).

Respectfully, this court does not agree that *Lopez* places the regulation of intrastate migratory bird habitats beyond the reach of federal commerce clause jurisdiction. It is well established that the commerce clause authorizes the federal government to regulate activities whose effect on interstate commerce is substantial only in the aggregate. *See, e.g., Wickard v. Filburn,* 317 U.S. 111, 127–128, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (commerce clause allows regulation of private commercial transactions that have a substantial effect on interstate commerce when "taken together with that of many others" but are otherwise trivial); *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) ("where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence"); *Fry v. United States,* 421 U.S. 542, 547, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975) (purely intrastate activity may be regulated "where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations"). The Supreme Court expressly affirmed this line of cases in *Lopez,* 514 U.S. at 557, *quoting Wirtz,* 392 U.S. at 197 n. 27. Distinguishing *Wickard* on the facts, the *Lopez* Court held that the criminal statute at issue did not concern activities which might substantially affect interstate commerce through "repetition" or when "viewed in the aggregate." 514 U.S. at 560–561, 567. Thus, while the *Lopez* decision may help to define the outer limits of federal

commerce clause jurisdiction, it does not signal a retreat from the constitutional principles set forth in *Wickard* and its progeny.

The migratory bird rule finds ample support in this line of cases. Migratory birds have long been regarded as a proper subject for federal commerce clause regulation. *See Andrus v. Allard*, 444 U.S. 51, 63 n. 19, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) ("assumption that the national commerce power does not reach migratory wildlife is clearly flawed"); *Hoffman Homes II*, 999 F.2d at 261 ("millions of people annually spend more than a billion dollars on hunting, trapping, and observing migratory birds"); *Cochrane v. United States*, 92 F.2d 623, 627 (7th Cir. 1937) (commerce clause allows federal government "to protect the game, nongame, and insectivorous birds which migrate with the changing seasons"). By implication, the power to protect migratory birds extends to the habitats in which they live. While the destruction of a single habitat is unlikely to affect the viability of migratory bird populations, the destruction of numerous such habitats may, in the aggregate, have a substantial affect on their livelihood. *See Hoffman Homes II*, 999 F.2d at 261 (cumulative loss of habitat has reduced the population of many bird species and has impaired the ability of people to hunt, trap, and observe them). On this point, the following analysis is persuasive:

Isolated wetlands provide habitat to migratory birds whose continued existence supports billions of dollars in interstate commerce. The incremental destruction of migratory bird habitat directly and negatively impacts migratory bird populations and, thereby interstate commerce. Isolated wetlands are a crucial link in the direct chain of causation between healthy migratory bird populations and interstate commerce. It should, therefore, be irrelevant whether a migratory bird is ever observed, photographed, or hunted at the particular isolated wetland in question. Unlike in *Lopez*, the connection of isolated wetlands to interstate commerce is well-documented and does not require the court to "pile inference upon inference" in a manner that gives rise to a general federal police power.

Lori J. Warner, "The Potential Impact of United States v. Lopez on Environmental Regulations," 7 *Duke Environmental Law & Policy Forum* 321, 354–355 (1997) (citations omitted). For these reasons, the commerce clause authorizes the federal government to regulate isolated intrastate waters that provide a habitat for migratory birds even if the particular birds on the site do not substantially affect interstate commerce.[2]

### B. Evidentiary Basis for Jurisdiction

■ Plaintiff argues that the agency's decision to extend jurisdiction over the proposed balefill site was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). It is well established that a final agency decision is entitled to a "presumption of regularity" and that the court must refrain from substituting its own judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court must uphold the decision so long as it was based on a consideration of the relevant factors and

---

2. The court notes that the issues presented in this section have drawn considerable attention from academics. *See, e.g.*, Elaine Bueschen, "Do Isolated Wetlands Substantially Affect Interstate Commerce?" 46 *Am.U.L.Rev.* 931 (1997); Robert D. Icsman, "Hoffman Homes, Inc. v. Administrator, U.S. EPA: The Seventh Circuit Gets Bogged Down in Wetlands," 54 *Ohio St. L.J.* 809 (1993); Edward Alburo Morrissey, "The Jurisdiction of the Clean Water Act Over Isolated Wetlands: The Migratory Bird Rule," 22 *J. Legis.* 137 (1996); Dennis J. Priolo, "Section 404 of the Clean Water Act: The Case for Expansion of Federal Jurisdiction Over Isolated Wetlands," 30 *Land & Water L.Rev.* 91 (1995); Stephen Jay Stokes, "The Limit of Government's Regulatory Authority Over Non–Adjacent Wetlands: Hoffman Homes, Inc. v. EPA," 15 *Energy L.J.* 137 (1994); Lori J. Warner, "The Potential Impact of United States v. Lopez on Environmental Regulations," 7 *Duke Envtl. L. & Pol'y F.* 321, 354–355 (1997). While some complain that the migratory bird rule could bring every puddle and pond in the nation under the umbrella of federal control, this argument overlooks the fact that the question of federal jurisdiction has a substantial factual component that must be examined on a case-by-case basis. To establish that an intrastate waterway is subject to jurisdiction under the migratory bird rule, an agency must first determine as a factual matter that it bears the distinctive features of a "habitat."

was free from clear errors of judgment. *Id.* 401 U.S. at 416. The burden of persuasion rests on the party seeking to overturn the administrative decision. *Schweiker v. McClure,* 456 U.S. 188, 196, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). The court must therefore decide whether, based on the entire administrative record, it was reasonable for the Corps to determine that the proposed balefill site was "a suitable or potential habitat for migratory birds." *Hoffman Homes II,* 999 F.2d at 261.

The Army Corps of Engineers initially asserted jurisdiction over the waters of the SWANCC property after learning that four species of migratory birds were observed there by the Illinois Nature Preserves Commission. During the ensuing permit review process, the agency gathered an extensive volume of supplemental information about the avifauna and topography of the site. These included a catalogue of the avian and waterfowl species observed on or near the SWANCC site (R. 2,462–2,469; 40,328–40,-358), two lengthy environmental impact reports describing the flora and avifauna of the property and the potential impact of the balefill project (R. 38,636–38,779; 40,409–40,-512), and detailed information about specific migratory bird populations on the site (R. 2,428–2,461; 2,329–2,384; 45,885–45,887). The Corps argues that this evidence was more than sufficient to support its finding that the waters of the SWANCC property were used as a habitat by migratory birds.

Plaintiff offers at least three reasons why the court should hold otherwise. First, plaintiff argues that the agency should have limited its analysis to the 17.6 acres of water in the permit area rather than considering the waters on the property as a whole. Plaintiff suggests that the record contains no

evidence that the waters of the permit area itself serve as a habitat for migratory birds. Plaintiff relies on *Hoffman Homes II,* 999 F.2d at 261, where the Seventh Circuit determined that the EPA could not assert jurisdiction over a small pond based on evidence that a nearby but hydrologically dissimilar water area was a suitable habitat for migratory birds. Here, however, plaintiff has not explained how the waters on the balefill site are hydrologically distinct from those of the property as a whole. To the contrary, there is evidence that the SWANCC property is a "large, forested wetland complex" (R. 15,579) which contains an "extensive labyrinth of open water" (R. 40,334). By extending jurisdiction over the entire "labyrinth" of water on the site, the Corps implicitly determined that each component part of that system could serve as a habitat for migratory birds. Because plaintiff presents no evidence that the 17.6 acres of water in the permit area are distinct from those on the rest of the property, it has failed to show that the agency's jurisdictional decision was improper as to the permit site.

■ Second, plaintiff argues that the permit area should not be subject to federal jurisdiction because it cannot support a viable population of migratory birds.[3] Citing several studies, plaintiff predicts that veeries will be unable to breed successfully on its property. It argues that the great blue heron colonies are not subject to federal jurisdiction under the migratory bird rule because the herons nest in trees rather than in the water. Plaintiff also points out that several of the migratory bird species identified on the site between 1988 and 1992 were found only in small numbers or not at all in 1993. Although the Corps raises a number

**3.** The agency argues that the presence of migratory birds by itself is sufficient to create federal jurisdiction over the waters on the SWANCC property, and the quality of the habitat is only relevant to the permit determination. This overlooks the fact that federal jurisdiction extends only to habitats that are "suitable" for migratory birds. *Hoffman Homes II,* 999 F.2d at 261. The concept of viability is central to the jurisdictional analysis because it distinguishes genuine habitats from the "parking lot puddles" of concern in *Hoffman Homes II,* 999 F.2d at 262. The Supreme Court did not suggest otherwise in *River-*

*side,* 474 U.S. at 135 n. 9, where it explained that the Army Corps of Engineers has presumptive jurisdiction over all "adjacent wetlands" because most such wetlands have a substantial effect on interstate commerce, and thus the agency need not consider whether any particular wetland has a substantial effect on interstate commerce until the permit process. This analysis is inapposite here because the concept of viability is implicit in the term "habitat," while there is nothing in the term "adjacent wetland" which suggests that it must have a significant effect on interstate waters.

of compelling objections to these arguments, one is dispositive: Plaintiff has not addressed any of the record evidence concerning at least a half dozen migratory bird species that were identified on its property. The fact that the balefill site serves as a habitat to these birds is sufficient to establish agency jurisdiction.

Finally, plaintiff argues that it was unreasonable for the Corps to assert jurisdiction over the property in November of 1987 after it declined to do so in April of 1986 and March of 1987. As an preliminary matter, it is unclear that the agency actually reversed its position. The Corps initially declined to extend jurisdiction over the balefill site for the limited reason that the property did not contain any protected lakes or wetlands. This did not, strictly speaking, rule out the possibility that the property was a habitat for migratory birds. Even if the Corps changed its position, however, it had sound reasons for doing so. *See NLRB v. Indianapolis Mack Sales & Service, Inc.*, 802 F.2d 280, 284 (7th Cir.1986) (when an agency changes course, it must give sound reasons for doing so). The agency first learned in July of 1987 that the balefill site was a potential habitat for migratory birds, and it was certainly not obliged to discover that information at an earlier time. It then gathered a substantial volume of information about the topography and avifauna of the SWANCC property. Because all of this information was sufficient to establish agency jurisdiction, any change in the agency's position was not arbitrary. For all of these reasons, the court finds that it was reasonable for the Corps to determine that all of the waters of the SWANCC property were used as a habitat by migratory birds.

## C.  Clean Water Act

██ Plaintiff contends that the migratory bird rule goes beyond its statutory mandate because the Clean Water Act only authorizes federal regulations that deal strictly with water quality. The court must defer to an agency's interpretation of its own authorizing statute so long as that interpretation is reasonable and not in conflict with the expressed intent of Congress. *United States v.*

*Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, the court must decide whether it was reasonable for the Army Corps of Engineers to interpret the statutory term "waters of the United States" to include intrastate waters that provide a habitat for migratory birds.

The Seventh Circuit arguably resolved this question in *Hoffman Homes II*, 999 F.2d 256. The issue in that case, as defined by the court, was whether it was reasonable for the EPA to construe the term "other waters" in 40 C.F.R. § 230.3(s)(3) to include waters that serve as a habitat for migratory birds. *Id.* at 260. Although the court did not expressly consider whether the regulation was within the scope of the Clean Water Act, it arguably reached the issue by implication. Vacating an earlier decision in which it held that the regulation was beyond its statutory mandate, the court explained that the EPA's interpretation of the regulation was both reasonable and authorized by the commerce clause. *Id.* at 260–261. In light of the fact that the Clean Water Act extends federal jurisdiction to the limits of the commerce clause, this holding virtually implied that the migratory bird rule was consistent with its authorizing statute. *Id.* at 261. It is also apparent that the court could not have reached its decision in the case if the regulation at issue were illegal. Because the Seventh Circuit did not address the issue directly, however, the court will discuss it here.

Both the language and the legislative history of the Clean Water Act suggest that it authorizes the regulation of intrastate migratory bird habitats. The purpose of the statute is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In part, this is necessary to achieve "the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a)(2). Moreover, the statute authorizes the EPA to promulgate regulations in order to protect fish and wildlife. 33 U.S.C. § 1343(c)(1). To the extent that the actual language of the Clean

Water Act reveals that Congress intended to protect wildlife, the migratory bird rule would appear to be a permissible construction of that statute.

The legislative history of the Clean Water Act leads to the same conclusion. That history reveals that Congress intended "to extend Clean Water Act jurisdiction over waters of the United States to the maximum extent possible under the Commerce Clause." S.Rep. No. 1236, 92nd Cong., 2d Sess. 144 (1972), U.S.C.C.A.N.1972, at pp. 3668, 3776. The Seventh Circuit has long recognized that Congress intended to make the Clean Water Act as far-reaching as the commerce clause permits. See Rueth v. U.S. EPA, 13 F.3d 227, 231 (7th Cir.1993); United States v. Huebner, 752 F.2d 1235, 1239 (7th Cir.1985); United States v. Byrd, 609 F.2d 1204, 1209 (7th Cir.1979). To the extent that the commerce clause authorizes the federal government to regulate intrastate migratory bird habitats, then, the Clean Water Act must as well. For these reasons, the court finds that 33 C.F.R. § 328.3(a)(3), as applied to intrastate · migratory bird habitats, is a reasonable construction of the Clean Water Act.

Notably, the Fourth Circuit reached the opposite conclusion in United States v. Wilson, 133 F.3d 251 (4th Cir.1997). In that case, the court explained that 33 C.F.R. § 328.3(a)(3) went beyond its statutory mandate because the term "waters of the United States" cannot include intrastate or nonnavigable waters whose degradation or destruction could affect interstate commerce. Id. at 256–257. Relying generally on the Supreme Court's decision in Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626, the majority explained that the phrase "waters of the United States" must refer "to waters which, if not navigable in fact, are at least interstate or closely related to navigable or interstate waters." Id. at 257. In a separate opinion, Judge Luttig declined to adopt this portion of the majority opinion on the grounds that it was based on an overly expansive reading of Lopez. Id. at 266.

This court respectfully declines to follow the majority in Wilson. Because the scope of federal regulatory jurisdiction under the Clean Water Act is coextensive with that of the commerce clause, and because the commerce clause authorizes the federal regulation of intrastate migratory bird habitats, the migratory bird rule must be a valid application of the Clean Water Act. For the reasons discussed in Part II.A. of this opinion, the court does not believe that Lopez requires a contrary result. On this point, then, the court agrees with the Ninth Circuit that "[t]he commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species." Leslie Salt II, 896 F.2d at 360.

### D. Administrative Procedure Act

▮▮▮ Plaintiff argues that the migratory bird rule was promulgated without public notice and comment in violation of the APA. That statute requires federal agencies to provide notice and· an opportunity for public comment before they promulgate or amend administrative regulations, but it creates an exception for interpretive rules and general statements of policy. 5 U.S.C. § 553. An interpretive rule is one in which an agency explains what a statute means or reminds parties of existing duties, while a substantive rule creates altogether new rights or duties. Metropolitan School Dist. of Wayne Township v. Davila, 969 F.2d 485, 489–90 (7th Cir.1992); see also American Hospital Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C.Cir.1987). Because the parties agree that the migratory bird rule was adopted without notice and comment, the court need only decide whether the rule is substantive or interpretive.

This issue was addressed ·in Tabb Lakes, Ltd. v. United States, 715 F.Supp. 726, 728–729 (E.D.Va.1988). In that case, a landowner sought a declaratory judgment that his property was not subject to federal jurisdiction because it did not contain "other waters" as defined by 33 C.F.R. § 328.3(a)(3). Id. at 727. The Army Corps of Engineers argued that it had jurisdiction over the site pursuant to an internal memorandum which explained that the term ."other waters" included those which "are used or could be used as habitat by other migratory birds which cross state

lines." *Id.* at ·728. The district court held that the memorandum was a substantive rule-making because it had a "significant effect on public interests" and was "intended to have the full force and effect of a substantive rule." *Id.* at 728–729. Accordingly, the court held that the memorandum was adopted in violation of the notice and comment requirements of the APA and did not confer federal jurisdiction over the property in question. *Id.* at 729.

In an unpublished opinion, a divided panel of the Fourth Circuit affirmed this holding without explanation. *See Tabb Lakes, Ltd. v. United States,* 885 F.2d 866 (4th Cir. 1989) (per curiam) (text at 1989 WL 106990). In dissent, Judge Hall suggested that the district court had erred by considering the impact of the rule instead of limiting its analysis to the question of whether the memorandum created new rights or duties. *Id.* at \*2 (Hall, J., dis.). He reasoned that the memorandum did not give rise to new law because the statutory term "waters of the United States" was intended to have "the broadest possible constitutional interpretation" under the commerce clause, and the memorandum simply identified "what contacts with interstate commerce are sufficient to bring a given wetland within the jurisdictional reach" of that statute. *Id.* at \*3.

More recently, the Ninth Circuit discussed this question in *Leslie Salt IV,* 55 F.3d 1388. When the plaintiff first raised this issue on appeal in *Leslie Salt II,* 896 F.2d 354, the court declined to address it and thus held by implication that the rule was procedurally sound. 55 F.3d at 1393. When the court revisited the issue in *Leslie Salt IV,* its review was limited to the question of whether its prior holding was clearly erroneous. *Id.* at 1394. Relying on *Hoffman Homes II,* 999 F.2d at 261, where the Seventh Circuit held that the term "other waters" in both 40

C.F.R. § 230.3(s)(3) and 33 C.F.R. § 328.3(a)(3) could be read to include waters used by migratory birds, the Ninth Circuit reasoned by analogy that the migratory bird rule could be viewed as an interpretation of the Clean Water Act rather than a substantive rule-making. *Leslie Salt IV,* 55 F.3d at 1394. In a somewhat narrow holding, then, the court concluded that it was "plausible" to construe the migratory bird rule as an interpretation of the Clean Water Act. *Id.*

It is the opinion of this court that the migratory bird rule is interpretive rather than substantive.[4] The Clean Water Act authorizes the EPA and the Army Corps of Engineers to exercise regulatory jurisdiction over the "waters of United States." 33 U.S.C. § 1362(7). Pursuant to this authority, the Army Corps of Engineers adopted a regulation in 1977 which defined the term "navigable waters" to include isolated intrastate waters whose "degradation or destruction could affect interstate commerce." 33 C.F.R. § 323.2(a)(5) (1977), 42 Fed.Reg. 37,-144 (July 19, 1977). In 1986, the Corps renumbered this provision as 33 C.F.R. § 328.3(a)(3) but left the substance of the regulation largely unchanged. The "migratory bird rule" appears in the preamble to the 1986 version of the regulations. 51 Fed. Reg. 41,216 (November 13, 1986).

In the preamble, the Corps explained that the purpose of the reorganization was "to clarify the scope of the Section 404 permit program." 51 Fed.Reg. 41,216. Rather than change the existing definitions, it sought to clarify them by putting them in a separate and distinct part of the regulation. 51 Fed. Reg. 41,216–41,217. The agency then explained that the term "waters of the United States" includes those:

a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or

---

4. Defendant suggests that the Seventh Circuit addressed this question in *Hoffman Homes II,* 999 F.2d at 261. Although the issue was raised in one of the briefs in that case, the court opted not to address it. (Hearing 5/22/97 Tr. at 29.) Arguably, however, the court ruled on the matter by implication when it held that it was reasonable for the EPA to interpret the term "other

waters" in 40 C.F.R. § 230.3(s)(3) to include those used as a habitat for migratory birds. *Hoffman Homes II,* 999 F.2d at 261; *see also Leslie Salt IV,* 55 F.3d at 1393. Because the Seventh Circuit did not offer a complete discussion of the question, however, the court will treat the issue as one of first impression in this circuit.

b. Which are or would be used as habitat by other migratory birds which cross state lines; or

c. Which are or would be used as habitat for endangered species; or

d. Used to irrigate crops sold in interstate commerce.

51 Fed.Reg. 41,217. For additional clarification, the agency then listed five examples of waters that are not generally considered to be "waters of the United States." 51 Fed. Reg. 41,217. The agency emphasized that the reorganization was not intended to expand or retract the scope of agency jurisdiction, but rather "to clarify the scope of the 404 program by defining the terms in accordance with the way the program is presently being conducted." 51 Fed.Reg. 41,217.

There are at least two reasons why the preamble was not a substantive rulemaking. First, the agency itself intended for the preamble to be interpretive. *See Davila,* 969 F.2d at 489 (characterization of a rule by an agency is relevant to whether it is substantive or interpretive). The agency expressly stated that it intended to clarify the scope of the existing section 404 permit program rather than to change existing definitions or to expand its jurisdiction. This is corroborated by the structure of the preamble, which sets forth the migratory bird rule in juxtaposition to a list of waters that are not generally considered to be subject to federal regulation.

More importantly, however, the migratory bird rule does not create new legal rights or duties, for it does not expand the jurisdictional reach of the Clean Water Act or the regulations promulgated thereunder. By authorizing the Army Corps of Engineers to regulate the "waters of the United States," the Clean Water Act extended the jurisdiction of these agencies to the outer limits of the commerce clause. *Rueth,* 13 F.3d at 231. Pursuant to this statutory authority, the Army Corps of Engineers defined the term "navigable waters" to include all intrastate waters whose degradation or destruction could affect interstate commerce. 33 C.F.R. § 328.3(a)(3). In effect, this "catch-all" provision simply reiterates that the jurisdiction of the agency is coextensive with that of the commerce clause. Because the commerce clause permits the Corps to regulate intrastate migratory bird habitats, the bird rule cannot be said to increase the jurisdiction of that agency. Rather than creating new rights or duties, then, the preamble simply clarifies that the regulation of intrastate migratory bird habitats falls within the scope of the agency's commerce clause jurisdiction. Accordingly, the court finds that the migratory bird rule was not subject to the notice and comment requirements of the APA.

On this point, then, the court expressly declines to follow the reasoning of the district court in *Tabb Lakes,* 715 F.Supp. 726. The fact that the bird rule carries the "force and effect of a substantive rule" or has a "significant effect on public interests" does not, as the court in that case reasoned, imply that the rule creates *new* substantive rights or duties. *Id.* at 728–729. For the reasons described above, the court believes that the better position on this issue is represented by Judge Hall's dissenting opinion in *Tabb Lakes v. U.S.,* 885 F.2d 866 (4th Cir.1989) (per curiam) 1989 WL 106990, at *2 (Hall, J., dis.), and the Ninth Circuit's opinion in *Leslie Salt IV,* 55 F.3d 1388.

III. *Conclusion*

For the reasons stated above, the court finds that defendant Army Corps of Engineers did not exceed its authority under the commerce clause by extending regulatory jurisdiction over the waters of plaintiff's proposed balefill site pursuant to 33 C.F.R. § 328.3(a)(3); as applied in this case, 33 C.F.R. § 328.3(a)(3) does not exceed its mandate under the Clean Water Act; the extension of regulatory jurisdiction over the proposed balefill Site was not arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A); and the migratory bird rule set forth at 51 Fed.Reg. 41,217 was exempt from the notice and comment requirements of the APA, 5 U.S.C. § 553.

ORDERED: Defendant's motion for summary judgment is granted; plaintiff's motion for summary judgment is denied.