**UNITED STATES of America, Plaintiff,**

v.

**HALLMARK CONSTRUCTION COMPANY, Defendant.**

**No. 97 C 3682.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 10, 1998.

---

Christopher Eric Tracy, United States Attorney's Office, Chicago, IL, for Plaintiff.

Johnine J. Brown, Sheila H. Deely, Julie Dana Melvin, The Brown Environmental Law Group, P.C., Chicago, IL, Maureen Martin, Martin Law Firm, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

The United States of America sues Hallmark Construction Company ("Hallmark") for allegedly filling a five-acre isolated wetland ("Area B") without obtaining authorization under Section 404 of the Clean Water Act, 33 U.S.C. § 1344. The government seeks restoration of Area B and/or mitigation to address the loss of wetland area. Hallmark argues there is no basis for federal jurisdiction over Area B, the United States is not a proper plaintiff, and the complaint is barred by the statute of limitations. Hallmark moved for summary judgment pursuant to Fed.R.Civ.P. 56. On July 23, 1998, the court granted Hallmark's motion, finding the United States an improper party plaintiff. On September 9, 1998, the court granted the United States' motion to reconsider the July 23rd judgment and vacated its prior decision. The court now addresses the other issues raised by Hallmark in its previous motion for summary judgment.

### BACKGROUND

The following facts are undisputed unless otherwise noted. Hallmark is an Illinois corporation in the business of developing property. Def. 12(M) ¶ 2. In 1988, Hallmark purchased the former Swift Research Farm in Frankfort, Illinois and began developing the Heritage Knolls subdivision. *Id.* ¶ 26.

Area B was a natural topographical depression in the middle of the farm. *Id.* ¶¶ 2, 11. The farm contained underground clay tiles for drainage. The parties dispute the extent to which the underground tiles successfully drained Area B in the years before development. *See, e.g.,* Def. 12(M) and Pl. 12(N) ¶¶ 8, 13, 14, 15, 19. The United States points to historical aerial photographs as evidence of inundation and saturation in Area B. John Kestel, the person who farmed the land purchased by Hallmark, states that Area B was never ponded over for more than four consecutive days. Hallmark points to computer modeling evidence suggesting that Area B could not have been inundated for 15 or more consecutive days during the growing season. Def. 12(M) ¶ 65.

Hallmark did not begin development in Area B until 1989. Def. 12(M) ¶ 27. The parties dispute whether Area B provided substantial habitat, nesting, feeding, or other value to migratory birds different from that provided by the surrounding farm fields. *See* Def. 12(M) and Pl. 12(N) ¶ 25. But it is undisputed that John Kestel saw geese in his fields, including Area B. Today, Area B contains an artificial five-acre stormwater detention/retention pond, roads, and several homes. Def. 12(M) ¶ 40. Although the present stormwater detention area stores more water than Area B stored prior to development, the parties dispute whether the quality of the water has improved and whether it provides a better or worse habitat for migratory birds. *Id.* ¶ 46; Pl. 12(N) ¶¶ 24 – 25, 46.

In 1990—after development began—Hallmark's civil engineer recommended that Hallmark hire Planning Resources, Inc. to inspect Heritage Knolls for the presence of wetlands. *Id.* ¶ 28. Planning Resources inspected Heritage Knolls in accordance with the 1989 Federal Manual For Identifying and Delineating Jurisdictional Wetlands ("1989 Manual") and prepared a report.[1] *Id.* ¶ 29. Although other areas of the farm had standing water during the inspection, Area B was neither saturated nor inundated. *Id.* ¶ 32.[2]

---

1. The *1989 Manual* was rescinded in 1991. When the 1989 Manual was rescinded, the 1987 Corps of Engineers Wetlands Delineation Manual ("1987 Manual") was retroactively reinstated for the time period at issue in this case.

2. The government argues the lack of saturation or inundation in Area B may be explained by the fact construction was underway by the time Planning Resources visited the site, including grading for roads and utility crossings and the

Nonetheless, Planning Resources concluded Area B was a "seasonally flooded farmed wetland" based on the presence of a flotsam ring (or drift lines), hydrophytic vegetation, and hydric soils. Pl. 12(N) ¶¶ 34, 35. A flotsam ring is created by dead or drowned vegetative debris deposited in a circular pattern where temporary inundation has occurred and receded.

In August 1990, Hallmark submitted Planning Resources' report to the United States Army Corps of Engineers ("the Corps"). *Id.* ¶ 29. The Corps requested that Hallmark fill out an "after-the-fact" permit application and provide a mitigation plan to address the loss of wetland area. Over the course of more than five years, the Corps repeatedly requested (and eventually demanded) that Hallmark provide an adequate mitigation plan. In April 1994, Hallmark retained SDI Consultants, Ltd. ("SDI") to write a proposal for a mitigation plan. *Id.* ¶ 53. SDI reviewed all available historical data about Area B and concluded that it had not been a farmed wetland after all. SDI concluded development of Area B did not require mitigation because it was "prior converted cropland" lacking wetland hydrology. *Id.* ¶ 56.

The Corps asked the National Resources Conservation Service ("the Conservation Service") to determine whether wetlands previously existed on Heritage Knolls. The Conservation Service's wetland map, prepared in 1987 or 1988, designates approximately five acres of Area B as wetland. The Conservation Service makes wetland determinations based on examination of aerial photographs and other historical data. Def. 12(M) ¶ 61; Pl. 12(N) ¶ 61. The parties dispute whether aerial photographs from 1964, 1970, 1976 and 1980 and crop compliance photographs from 1980, 1982, 1984, 1986 and 1988 show evidence of inundation of Area B. *Id.* ¶ 64.

After attempts to resolve the dispute proved unsuccessful, the Corps referred the matter to the United States Attorney; this suit was filed in May 1997. The Corps never consulted with the Environmental Protection Agency regarding Area B or its decision to refer this case to the United States Attorney for civil enforcement. *Id.* ¶ 67.

possible placement of a storm sewer near Area

## DISCUSSION

## I. SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1209 (7th Cir.1993). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir.1992). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir.1993).

## II. FEDERAL JURISDICTION OVER AREA B

### A. Constitutional and Statutory Basis for Federal Jurisdiction

Section 404(a) of the Clean Water Act authorizes the Army Corps of Engineers to issue permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The Clean Water Act defines navigable waters as "the waters of the United States." 33 U.S.C. § 1362(7). By regulation, the Corps defines the phrase "waters of the United States" to include "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign

B. *See* Pl. 12(N) ¶ 32.

commerce." 33 C.F.R. § 328.3(a)(3). In a preamble to this regulation, the Corps explains that the term "other waters" includes those which "are or would be used as habitat by other migratory birds which cross state lines." 51 Fed.Reg. 41,217 (Nov. 13, 1986). This preamble language is commonly known as the "migratory bird rule."

Hallmark argues that to the extent the Clean Water Act permits regulation of isolated intrastate wetlands that *could* affect interstate commerce based on actual or potential use by migratory birds, Congress has exceeded its powers under the Commerce Clause. The Seventh Circuit first addressed this issue in *Hoffman Homes, Inc. v. Administrator, U.S. EPA*, 961 F.2d 1310 (7th Cir. 1992) ("Hoffman Homes I"). A residential developer was fined after it filled a one-acre pond without a permit. The EPA asserted jurisdiction over the pond pursuant to the migratory bird rule. The court held that the EPA's (and the Corps') regulation of isolated intrastate wetlands as "waters of the United States" was not authorized by the Clean Water Act. *Id.* at 1316. The court also held the EPA could not constitutionally exert jurisdiction over the pond based solely on its potential use as a habitat for migratory birds:

> Although we recognize that the Commerce Clause power is broad, it has never been extended to reach all areas in (much less those only potentially in) migratory bird flyways.... The Commerce Clause, at the very least, require some connection to human commercial activity.

961 F.2d at 1321–1322 (citations omitted).

On rehearing, the court vacated *Hoffman Homes I* and held that the migratory bird rule and the EPA's regulation of isolated intrastate wetlands did not violate the Commerce Clause. *Hoffman Homes, Inc. v. EPA*, 999 F.2d 256, 260 – 261 (7th Cir.1993) ("Hoffman Homes II"). The court explained that the potential use of wetlands by migratory birds was sufficient to support jurisdiction because "millions of people annually spend more than a billion dollars on hunting, trapping, and observing migratory birds" and "the cumulative loss of wetlands has reduced populations of many bird species." *Id.* at 261; *see also Leslie Salt Co. v. United States*, 55 F.3d 1388 (9th Cir.1995) ("Leslie Salt IV")

and *Leslie Salt Co. v. United States*, 896 F.2d 354 (9th Cir.1990) ("Leslie Salt II"), *cert. denied sub nom. Cargill, Inc. v. United States*, 516 U.S. 955, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995); *Utah v. Marsh*, 740 F.2d 799 (10th Cir.1984). Nevertheless, the court ruled in favor of the developer because the agency's finding that the particular site was a suitable or potential habitat for migratory birds was not supported by substantial evidence. 999 F.2d at 261–262.

Hallmark argues that *Hoffman Homes II* must be re-examined in light of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez*, the Supreme Court held that Congress exceeded its Commerce Clause powers by imposing criminal sanctions on the possession of handguns in local school zones. 514 U.S. at 551, 115 S.Ct. 1624, discussing 18 U.S.C. § 922(q). The government argued that the prevention of violent crime in local school zones was related to interstate commerce because education promotes a sound national economy, the threat of violence deters interstate travel, and the cost of violent crime is spread to the population as a whole through insurance. *Id.* at 563–564, 115 S.Ct. 1624. But the Court held that the possession of a gun in a local school zone was not "an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567, 115 S.Ct. 1624. The Court further explained that the statute could not be sustained under case law upholding the regulation of activities "that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 561, 115 S.Ct. 1624. The statute was therefore declared unconstitutional.

The Seventh Circuit has yet to re-examine *Hoffman Homes II* in light of *Lopez*, and it is not settled whether the rationale of *Lopez* renders the Corps' interpretation of the Clean Water Act unconstitutional. The Supreme Court denied *certiorari* in *Cargill, Inc. v. United States*, 516 U.S. 955, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995), which presented this very issue. Justice Thomas, dissenting from the denial of *certiorari*, stated that the migratory bird rule seemed "even more far-

fetched than [the basis for jurisdiction] offered, and rejected, in *Lopez.*" *Id.* at 408, 116 S.Ct. 407. Recently, the Fourth Circuit suggested that if the Corps' definition of "waters of the United States" were contained in a statute, that statute "would present serious constitutional difficulties, because, at least at first blush, it would appear to exceed congressional authority under the Commerce Clause." *See United States v. Wilson,* 133 F.3d 251, 257 (4th Cir.1997) (holding the Corps' definition of "waters of the United States" exceeded its authority under the Clean Water Act). But neither the dissent from denial of *certiorari* in *Cargill* nor the Fourth Circuit's *dicta* in *Wilson* make it clear that the Seventh Circuit would (or should) depart from its holding in *Hoffman Homes II.*

Another judge of this court recently addressed whether the rationale of *Hoffman Homes II* survived the Supreme Court's decision in *Lopez. See Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 998 F.Supp. 946 (N.D.Ill.1998) (Lindberg, J.). In *Solid Waste,* the court held the regulation of isolated intrastate migratory bird habitats was within Congress' commerce clause powers. *Id.* at 951. The court reasoned as follows: (1) it is well established that the Commerce Clause authorizes the federal government to regulate activities whose effect on interstate commerce is substantial only in the aggregate (citing cases); (2) unlike the possession of guns near school zones in *Lopez,* migratory birds have long been regarded as a proper subject for federal commerce clause regulation, *see, e.g., Hoffman Homes II,* 999 F.2d at 261 ("millions of people annually spend more than a billion dollars on hunting, trapping, and observing migratory birds"); and (3) by implication, the power to protect migratory birds extends to the habitats in which they live, *see id.* (the cumulative or aggregate loss of wetland habitats has reduced the population of many bird species and has impaired the ability of people to hunt, trap, and observe migratory birds). *Solid Waste,* 998 F.Supp. at 951–952.

Hallmark suggests *Solid Waste* presents an unsound interpretation of *Lopez* because it relies on the aggregate effect of activity as if no commercial or economic context were

necessary. According to Hallmark, *Lopez* stands for the broad proposition that for an activity to substantially affect interstate commerce it must be—viewed in isolation—an *economic* activity or transaction. *See Lopez,* 514 U.S. at 567, 115 S.Ct. 1624 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce"). Hallmark views the filling of an isolated intrastate wetland that was an actual or potential habitat for migratory birds as analogous to the possession of a gun in a local school zone, because neither activity bears the earmarks of an economic transaction. Hallmark gives *Lopez* an unnecessarily broad reading. Indeed, Hallmark's interpretation of *Lopez* has been expressly rejected by the Seventh Circuit. *See U.S. v. Wilson,* 73 F.3d 675, 685 (7th Cir.1995) ("we find no support for reading *Lopez* as permitting only regulation of economic activities exclusive of regulations that reach or affect economic activities. The Court's language is clear that the substantial effects test is not so limited").

Hallmark argues the government fails to submit evidence demonstrating the cumulative loss of wetlands actually results in an aggregate adverse effect on interstate commerce connected to migratory birds. But in *Hoffman Homes II,* the Seventh Circuit explicitly recognized the cumulative loss of wetland habitats has reduced the population of many bird species and has impaired the ability of people to hunt, trap, and observe those migratory birds. *See* 999 F.2d at 261. So long as *Hoffman Homes II* remains the law of this circuit, the government need not prove the aggregate economic effect of the cumulative loss of wetlands each time its application of the migratory bird rule is challenged.

■ Hallmark argues that *Hoffman Homes II* warrants re-examination. The arguments made by Hallmark are far from frivolous. But this is not a case where the Supreme Court has clearly abrogated the Seventh Circuit's reasoning in *Hoffman Homes II;* indeed, there is wide disagreement among courts and commentators about the implications and scope of the *Lopez* deci-

sion. Under these circumstances, the court declines to anticipate a departure from what might still be correctly viewed as the law of this circuit. Accordingly, the regulation of intrastate isolated wetlands based on their actual or potential use by migratory birds does not exceed Congress' powers under the Commerce Clause.

■ Moreover, the Corps has not exceeded its authority under the Clean Water Act by regulating intrastate isolated wetlands as "waters of the United States." The court notes a different conclusion was reached by the Fourth Circuit in *United States v. Wilson*, 133 F.3d 251 (4th Cir.1997). Whether or not *Wilson* is persuasive on this point, it articulates essentially the same view as *Hoffman Homes I*, 961 F.2d at 1314 (isolated intrastate wetlands are not "waters of the United States"). *Hoffman Homes I* was vacated by the Seventh Circuit, albeit without an explicit explanation why the agency's definition of "waters of the United States" was reasonable as a matter of statutory construction. Thus, the issue whether the Corps' definition is an unreasonable construction of the Clean Water Act was arguably resolved in *Hoffman Homes II. See Solid Waste*, 998 F.Supp. at 954–55 (by finding the agency's definition of "waters of the United States" did not exceed the limitations of the Commerce Clause and by applying that definition after vacating *Hoffman Homes I*, the Seventh Circuit implicitly found the definition reasonable); *Rueth v. U.S. Environmental Protection Agency*, 13 F.3d 227, 231 (7th Cir.1993) ("we are of the opinion that the wetland at issue falls under the broad definition of 'waters of the United States' in *Hoffman Homes* ").

Even assuming the reasonableness of the Corps' definition is still an open question in this circuit, the court is persuaded by the following analysis in *Solid Waste:*

> The purpose of the [Clean Water Act] is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In part, this is necessary to achieve "the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a)(2). Moreover, the statute authorizes the EPA to promulgate regulations in order to protect fish and wildlife. 33 U.S.C.

§ 1343(c)(1). To the extent that the actual language of the Clean Water Act reveals that Congress intended to protect wildlife, the migratory bird rule would appear to be a permissible construction of that statute.

998 F.Supp. at 954–955. Reasonable minds may differ whether isolated intrastate wetlands are "waters of the United States" for purposes of the Clean Water Act. Accordingly, the Corps' definition is entitled to deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ Hallmark argues the Corps' migratory bird rule was promulgated without public notice and comment in violation of the Administrative Procedure Act ("APA"). The APA requires federal agencies to provide notice and an opportunity for public comment before they promulgate or amend administrative regulations, but it creates an exception for interpretive rules and general statements of policy. 5 U.S.C. § 553. An interpretive rule explains what a statute means or reminds parties of existing duties, while a substantive rule creates altogether new rights and duties. *Metropolitan School Dist. v. Davila*, 969 F.2d 485, 489–90 (7th Cir.1992). After a thorough analysis, Judge Lindberg concluded that the migratory bird rule is an interpretive rule. *See Solid Waste*, 998 F.Supp. at 955–957. For the reasons discussed in *Solid Waste*, the court finds the migratory bird rule was not subject to the notice and comment requirements of the APA.

**B. Evidentiary Basis for Jurisdiction**

■ It is undisputed that geese used Area B. But the geese also used the surrounding farm fields, and the parties dispute whether Area B provided substantial habitat, nesting, feeding, or other value to migratory birds different from that provided by the surrounding farm fields. *See* Def. 12(M) and Pl. 12(N) ¶ 25. Hallmark argues there is insufficient evidence to support the government's position that Area B was an actual or potential habitat for migratory birds, citing *Hoffman Homes II*. But in *Hoffman Homes II*, there was no evidence that migratory birds actually used the wetland at issue ("Area A").

Nor was there evidence that Area A *in particular* was suitable as a migratory bird habitat. Rather, the government argued Area A was a suitable migratory bird habitat because Area A was similar to a nearby wetland that migratory birds actually used. The court found the record did not support the government's assertion that Area A was similar to the nearby wetland. Because there was no evidence that migratory birds used Area A and because there was no evidence that Area A possessed special characteristics that made it a particularly suitable habitat for migratory birds, the court determined there was no factual basis for jurisdiction over Area A. *See Hoffman Homes II,* 999 F.2d at 262.

Here, the parties dispute whether Area B provided substantial habitat, nesting, feeding, or other value to migratory birds different from that provided by the surrounding farm fields. *See* Def. 12(M) and Pl. 12(N) ¶ 25. In particular, the government offers the testimony of Michael J. Johnson, a fish and wildlife biologist with the United States Fish and Wildlife Service. Johnson explains that Area B provided a particularly suitable habitat for mallards and geese because it was a shallow basin that, when inundated, would have provided water between 10 to 25 centimeters deep—the depth in which mallards and geese are most comfortable feeding. Johnson further explains the birds would have fed not only on waste corn but also on the hydrophytic vegetation that existed in Area B (as evidenced by the report of Hallmark's first consultant, Planning Resources, Inc.). Unlike *Hoffman Homes II,* the government offers evidence from which the finder of fact could reasonably conclude Area B was particularly suitable as a habitat for migratory birds. To be sure, Johnson's testimony assumes that Area B actually became inundated, which is another disputed fact. But there is at least a genuine issue whether Area B was particularly suitable as a habitat for migratory birds.

■ Hallmark argues Area B was nonjurisdictional "prior converted cropland" based on the presence of functioning field tile, the farmer's testimony that Area B was never ponded over for more than four consecutive days, and computer modeling evidence suggesting that even without functioning field tile Area B could not have been inundated for 15 or more consecutive days during the growing season. The parties dispute the extent to which the underground tiles successfully drained Area B in the years before development. *See, e.g.,* Def. 12(M) and Pl. 12(N) ¶¶ 8, 13, 14, 15, 19. More importantly, the parties dispute whether aerial photographs from 1964, 1970, 1976 and 1980 and crop compliance photographs from 1980, 1982, 1984, 1986 and 1988 show evidence of significant or lengthy inundation of Area B. Def. 12(M) and Pl. 12(N) ¶ 64. Hallmark argues it is entitled to summary judgment because Kestel, the "disinterested" farmer, is the only person "with direct knowledge that Area B was dry enough to be farmed and was dominated by commodity crops" while "the government's witnesses, who have no personal knowledge of Area B during farming, base their post-development opinions mainly on subjective evaluation of aerial photographs." Reply at 2. Hallmark concludes that no reasonable jury could credit subjective evaluation of aerial photographs over direct personal knowledge and computer modeling evidence. The court does not agree. The United States may face an uphill battle in convincing a jury to credit its interpretation of aerial photographs over Hallmark's computer modeling evidence and Kestel's testimony that Area B was never inundated for longer than four days. But viewing the record in the light most favorable to the government, a reasonable jury could determine that Area B was jurisdictional "farmed wetland" rather than non-jurisdictional "prior converted cropland." Accordingly, genuine issues remain as to whether the government may exert jurisdiction over Area B.

## III.  STATUTE OF LIMITATIONS

■  28 U.S.C. § 2462 provides that:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture ... shall not be entertained unless commenced within five years from the date when the claim first accrued.

28 U.S.C. § 2642. It is also well-established that "an action on behalf of the United States

in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it...." *U.S. v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997) (quoting *E.I. DuPont De Nemours & Co. v. Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924)).

Here, the government seeks equitable relief. The Clean Water Act does not contain an express statute of limitations. The important question is whether the five-year statute of limitations set forth in 28 U.S.C. § 2642 for legal remedies applies to claims for equitable relief by the United States. The majority of courts have concluded that 28 U.S.C. § 2642 does not apply to claims for equitable relief by the United States. *See, e.g., U.S. v. Telluride Co.* 146 F.3d 1241 (10th Cir.1998); *U.S. v. Banks*, 115 F.3d 916 (11th Cir.1997). These courts express the better view. Accordingly, the United States' claims are not barred by the statute of limitations.

### CONCLUSION

The motion of defendant Hallmark Construction Company for summary judgment is denied.